# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE BELIZE BANK LIMITED, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 1:14-CV-0659 (BAH) |
| | ) |
| THE GOVERNMENT OF BELIZE, | ) |
| | ) |
| Respondent. | ) |
| | ) |

**PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS
PETITION AND IN REPLY TO RESPONDENT'S RESPONSE TO PETITION
TO CONFIRM FOREIGN ARBITRATION AWARD AND TO ENTER JUDGMENT**

Kristin Graham Koehler
DC Bar Number: 464422
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: (202) 736-8359
Facsimile: (202) 736-8711

Louis B. Kimmelman
DC Bar Number:  NY0179
Dana C. MacGrath
DC Bar Number:  NY0180
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5200
Facsimile:  (212) 839-5599

*Counsel for Petitioner*
The Belize Bank Limited

Dated: October 17, 2014

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 1

      1.     The Settlement Agreement and Loan Note ...................................... 1

      2.     The Belize Public Law Proceedings .................................................. 2

      3.     The Belize Private Law Proceedings ................................................. 4

      4.     The 2008 Arbitration ......................................................................... 5

ARGUMENT ........................................................................................................ 7

I.     THE DISTRICT COURT HAS SUBJECT MATTER JURISDICTION
       TO CONFIRM THE FINAL AWARD .................................................. 7

     A.    The FSIA's Arbitration Exception to Sovereign Immunity Applies to
           Confirmation of the Final Award .................................................... 7

         1.     The Arbitration Agreement Was Made by the GOB ...................... 8

         2.     The GOB's Argument Is Based on a Misreading of the
              FSIA ....................................................................................... 12

         3.     The Convention Applies to the Final Award ................................ 13

     B.    The GOB Waived Its Foreign Sovereign Immunity ................................. 15

II.    THIS COURT CANNOT DISMISS THE PETITION UNDER THE
       DOCTRINE OF FORUM NON CONVENIENS ................................... 16

     A.    The D.C. Circuit Has Held That There Is No Adequate Alternative
           Forum in an Award Enforcement Proceeding ........................................ 16

     B.    The Convention Does Not Permit a Forum Non Conveniens
           Dismissal ............................................................................................ 18

III.   THERE IS NO BASIS TO DISMISS THE PETITION FOR LACK OF
       PERSONAL JURISDICTION ............................................................ 19

IV.   THERE IS NO BASIS TO DISMISS BASED ON THE DOCTRINE OF
       INTERNATIONAL COMITY ............................................................ 21

V.      THE GOVERNMENT OF BELIZE HAS FAILED TO ESTABLISH A
        CONVENTION DEFENSE TO ENFORCEMENT OF THE AWARD ..............23

        A.      The Arbitral Tribunal Was Composed In Accordance with the LCIA
                Rules and the Parties' Arbitration Agreement ...........................................24

                1.      New York Convention Standard ....................................................24

                2.      The Formation of the Arbitral Tribunal ........................................27

                3.      The GOB's Challenges to the Tribunal ........................................27

                4.      The LCIA Division's Decision on Challenges .............................30

                5.      The LCIA Division's Rulings are Entitled to Deference in
                        this Confirmation Proceeding ........................................................35

        B.      Recognition of the Final Award Would Not Violate U.S. Public
                Policy ........................................................................................................36

        C.      The GOB's Argument that the Arbitration Did Not Meet the
                Minimum Requirements of Due Process is Baseless.................................38

        D.      The GOB Has Failed to Establish An Article V(1)(a) Defense................40

VI.     THE COURT SHOULD DECIDE ALL THE ISSUES RELATING TO
        THE PETITION TO CONFIRM TOGETHER ....................................................41

VII.    DISCOVERY IS INAPPROPRIATE...................................................................42

VIII.   PREJUDGMENT INTEREST SHOULD BE AWARDED .................................43

IX.     THE JUDGMENT SHOULD BE MADE IN U.S. DOLLARS ...........................44

CONCLUSION .................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    528 F.3d 934 (D.C. Cir. 2008) ...................................................................18

*AO Techsnabexport v. Globe Nuclear Servs. and Supply*,
    656 F. Supp. 2d 550 (D. Md. 2009) ......................................................26, 35

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*,
    492 F.3d 132 (2d Cir. 2007) ......................................................................37

*Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*,
    179 F.3d 1279 (11th Cir. 1999) .................................................................12

*Bamberger v. Clark*,
    390 F.2d 485 (D.C. Cir. 1968) ..................................................................44

*BCB Holdings Ltd. v. The Attorney Gen. of Belize*,
    [2013] CCJ 5 (AJ) ..............................................................................10, 21

*Belize Social Dev. Ltd. v. Gov't of Belize*,
    5 F. Supp. 3d 25 (D.D.C. 2013) ...............................................................42

*Belize Social Dev. Ltd. v. Gov't of Belize*,
    668 F.3d 724 (D.C. Cir. 2012) ........................................................ passim

*Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*,
    415 F. Supp. 133 (D.N.J. 1976) ................................................................39

*Bryson v. Gere*,
    268 F. Supp. 2d 46 (D.D.C. 2003) ......................................................26, 27

*Century Int'l Arms, Ltd. v. Fed. State Unitary Enter.*,
    172 F. Supp. 2d 79 (D.D.C. 2001) ............................................................43

*China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*,
    334 F.3d 274 (3d Cir. 2003) ................................................................40, 41

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
    393 U.S. 145 (1968) ..................................................................................37

*Compagnie des Bauxites de Guinee v. Hammermills, Inc.*,
    Civ. A. No. 90-0169, 1992 WL 122712 (D.D.C. May 29, 1992) .........25, 39, 42, 43

*Consolidated Edison Co. of NY, Inc. v. Bodman*,
   445 F.3d 438 (D.C. Cir. 2006) ...............................................................................15

*Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*,
   932 F. Supp. 2d 153 (D.D.C. 2013) .................................................................43, 44

*Creighton Ltd. v. Gov't of the State of Qatar*,
   181 F.3d 188 (D.C. Cir. 1999) ...............................................................................21

*El-Fadl v. Cent. Bank of Jordan*,
   75 F.3d 668 (D.C. Cir. 1996) .................................................................................17

*Empresa Constructora Contex Limitada v. Iseki, Inc.*,
   106 F. Supp. 2d 1020 (S.D. Cal. 2000) ..................................................................43

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*,
   403 F.3d 85 (2d Cir. 2005) ...............................................................................25, 35

*Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Republic of Peru*,
   665 F.3d 384 (2d Cir. 2011) ...................................................................................17

*First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda*,
   877 F.2d 189 (2d Cir. 1989) ...................................................................................12

*GSS Grp. Ltd. v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012) ...............................................................................19

*Gulf Res. Am., Inc. v. Republic of Congo*,
   370 F.3d 65 (D.C. Cir. 2004) .......................................................................11, 12, 16

*Hall Street Assocs., LLC v. Mattel, Inc.*,
   552 U.S. 576 (2008) ...............................................................................................41

*HBK Sorce Fin. v. Ameriprise Fin. Servs.*,
   No. 4:10-cv-02284, 2012 WL 4505993 (N.D. Ohio Sept. 28, 2012) .....................26

*Howard Univ. v. Metro. Campus Police Officers Union*,
   512 F.3d 716 (D.C. Cir. 2008) ...............................................................................10

*Hurst v. Socialist People's Libyan Arab Jamahiriya*,
   474 F. Supp. 2d 19 (D.D.C. 2007) ...........................................................................9

*Hrvatska Elektroprivreda, d.d. v. Republic of Slovenia*,
   ICSID Case No. ARB/05/24 (May 6, 2008) ........................................31, 32, 33, 34

*Imperial Ethiopian Gov't v. Baruch-Foster Corp.*,
   535 F.2d 334 (5th Cir. 1976) .................................................................................42

*In re Andros Compania Maritima, S.A. & Marc Rich & Co., A.G.,*
  579 F.2d 691 (2d Cir. 1978) ............................................................................. 43

*In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine,*
  311 F.3d 488 (2d Cir. 2002) ............................................................................. 17

*In re Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.,*
  480 F. Supp. 352 (S.D.N.Y. 1979) ................................................................... 37

*In re Waterside Ocean Navigation Co., Inc., & Int'l Navigation Ltd.,*
  737 F.2d 150 (2d Cir. 1984) ............................................................................. 44

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH,*
  141 F.3d 1434 (11th Cir. 1998) ....................................................................... 37

*Int'l Tech. Integration, Inc. v. Palestine Liberation Org.,*
  66 F. Supp. 2d 3 (D.D.C. 1999) ................................................................. 26, 27

*Int'l Trading and Indus. Inv. Co. v. Dyn-Corp Aerospace Tech.,*
  763 F. Supp. 2d 12 (D.D.C. 2011) ........................................................ 11, 16, 42

*Iran Aircraft Indus. v. Avco Corp.,*
  980 F.2d 141 (2d Cir. 1992) ............................................................................. 38

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
  190 F. Supp. 2d 936 (S.D. Tex. 2001) ......................................................... 25, 36

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
  335 F.3d 357 (5th Cir. 2003) ........................................................................... 22

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
  364 F.3d 274 (5th Cir. 2004) ........................................................................... 36

*McKesson Corp. v. Islamic Republic of Iran,*
  116 F. Supp. 2d 13 (D.D.C. 2000) ................................................................... 44

*Menkes v. U.S. Dep't of Homeland Sec.,*
  637 F.3d 319 (D.C. Cir. 2011) ........................................................................... 9

*Mercier v. Sheraton Int'l, Inc.,*
  935 F.2d 419 (1st Cir. 1991) ............................................................................. 17

*Nat'l Council of Resistance of Iran v. Dep't of State,*
  251 F.3d 192 (D.C. Cir. 2001) ......................................................................... 20

*Nicor Int'l Corp. v. El Paso Corp.,*
  292 F. Supp. 2d 1357 (S.D. Fla. 2003) ........................................................... 38

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Paier (Rakta)*,
   508 F.2d 969 (2d Cir. 1974) ................................................................................ 38, 39

*Phaneuf v. Republic of Indonesia*,
   106 F.3d 302 (9th Cir. 1997) ..................................................................................... 12

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981) ................................................................................................... 17

*Porter v. Shah*,
   606 F.3d 809 (D.C. Cir. 2010) .................................................................................... 11

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.*,
   476 F.3d 278 (5th Cir. 2007) (en banc) ..................................................................... 37

*Practical Concepts, Inc. v. Republic of Bolivia*,
   811 F.2d 1543 (D.C. Cir. 1987) .................................................................................. 20

*Price v. Socialist People's Libyan Arab Jamahiriya*,
   294 F.3d 82 (D.C. Cir. 2002) .......................................................................... 19, 20, 21

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967) ................................................................................................... 13

*Rompetrol Group NV v. Romania*,
   ICSID Case No. ARB/06/3 (Jan. 14, 2010) ............................................................... 33

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ................................................................................................... 17

*Schwartz v. Merrill Lynch & Co., Inc.*,
   No. 09 Civ. 900 (WHP), 2009 WL 2496028 (S.D.N.Y. Aug. 5, 2009) ...................... 43

*Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*,
   354 F. App'x 689 (3d Cir. 2009) ................................................................................ 22

*Swiss Inst. of Bioinformatics v. Global Initiative on Sharing All Influenza Data*,
   No. 13-1274, __ F.3d __, 2014 WL 2810500 (D.D.C. Jun. 23, 2014) ....................... 21

*Telenor Mobile Commc'ns AS v. Storm LLC*,
   524 F. Supp. 2d 332 (S.D.N.Y. 2007), *aff'd on other grounds*, 584 F.3d 396 (2d Cir. 2009) ........................................................................................................................... 40

*TermoRio S.A., E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007) .............................................................................. 23, 41

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
411 F.3d 296 (D.C. Cir. 2005) ...................................................................... passim

*United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*,
721 F.3d 678 (D.C. Cir. 2013) ................................................................................37

*Velasco v. Gov't of Indonesia*,
370 F.3d 392 (4th Cir. 2004) ................................................................................12

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) ............................................................................15

*York Research Corp. v. Landgarten*,
927 F.2d 119 (2d Cir. 1991) ..................................................................................26

## STATUTES

9 U.S.C. § 10(a)(2) ...............................................................................................37, 38

9 U.S.C. § 202 ......................................................................................................13, 14

28 U.S.C. § 1330(a) ....................................................................................................16

28 U.S.C. § 1605(a)(1) ...............................................................................................15

28 U.S.C. § 1605(a)(2) ...............................................................................................12

28 U.S.C. §1605(a)(6) ......................................................................................... passim

28 U.S.C. § 1605(a)(6)(B) ............................................................................................8

Act of Nov. 16, 1988, Pub. L. No. 100-669, § 2, 102 Stat. 3969 .................................13

Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Article III ......... passim

## OTHER AUTHORITIES

Albert Jan van den Berg, *The New York Convention of 1958* (1981) ...........................40

Fed. R. App. P. 32.1 ...................................................................................................22

LCIA Rules Art. 11.1 .................................................................................27, 30, 31, 32

LCIA Rules Art. 2.3 .....................................................................................................27

LCIA Rules, Art. 23.1 ....................................................................................................9

LCIA Rules, Art. 23.2 ....................................................................................................9

Petitioner The Belize Bank Limited ("Petitioner" or the "Bank") submits this memorandum (i) in opposition to the memorandum in support of the motion of Respondent Government of Belize ("Respondent" or "GOB") to dismiss the petition (Dkt. No. 12) ("GOB Motion") and (ii) in reply to the GOB's preliminary response to the petition to confirm a foreign arbitration award (Dkt. No. 13) ("GOB Response").

## PRELIMINARY STATEMENT

After choosing to walk out of an arbitration proceeding, the GOB now seeks to prevent enforcement of the resulting award. Its arguments are devoid of merit. The parties entered into a commercial agreement that included an arbitration clause and an express waiver of sovereign immunity. Their arbitration clause provided for arbitration under the Rules of the London Court of International Arbitration ("LCIA") in London, England. The arbitral tribunal conducted the arbitration and rendered an unanimous final award ("Final Award") in accordance with the LCIA Rules. Although the GOB could have challenged the Final Award where it was rendered in London, England, it failed to do so. The Final Award should now be confirmed pursuant to Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207, and Article III of the New York Convention.[1]

## FACTUAL BACKGROUND

### 1.    The Settlement Agreement and Loan Note

It is undisputed that on March 23, 2007, the Bank and the GOB entered into the Settlement Deed and attached Loan Note. Kimmelman Decl., Ex. B ¶ 100;[2] GOB Motion at 3. Clause 9 of the Settlement Deed contains the arbitration agreement that is the basis for the award

---

[1] Convention on Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2157 (entered into force December 29, 1970) (the "Convention").

[2] Declaration of Louis B. Kimmelman, dated April 17, 2014 (Dkt. Nos. 1-2) ("Kimmelman Decl.").

in this enforcement proceeding.  Kimmelman Decl., Ex. C.  After the GOB breached the

payment terms of the Loan Note, the Bank commenced the first arbitration in May 2007 against

the GOB ("2007 Arbitration").  Kimmelman Decl., Ex. B ¶ 116.  In the 2007 Arbitration, the

Bank sought, *inter alia*, a declaration that the Settlement Deed and Loan Note "were valid."  *Id*.

¶ 116.  In its written response to the Bank's request for arbitration, the GOB expressly stated:

"The Government does not believe that there is any dispute under the March Settlement

Agreement and the March Loan Note."  Kimmelman Decl., Ex. D ¶ 13.  Importantly, the GOB

did not challenge the validity or enforceability of the arbitration clause in the Settlement Deed.

### 2.       The Belize Public Law Proceedings

It is also undisputed that in early 2007, the Association of Concerned Belizeans and other

public interest groups filed a lawsuit in Belize against the GOB challenging the legality of the

guarantee given by the GOB to the Bank in 2004 as well as the Settlement Deed and Loan Note

(the "Belize Public Law Proceedings").  Kimmelman Decl., Ex. B ¶ 111; GOB Motion at 4.

Essentially, the plaintiffs asserted that the Belize Prime Minister was not authorized to enter into

these agreements (i.e. the guarantee, Settlement Deed and Loan Note) because they required

prior legislature approval and such approval had not been obtained.  *Id*.[3]

The Belize Public Law Proceedings were ultimately appealed to the Privy Council, the

highest appellate court for Belize at that time, and resulted in a Judgment dated October 20,

2011.  Courtenay Decl., Ex. E.  In connection with this appeal, the parties, including the GOB,

submitted an Agreed Statement of Facts and Issues to the Privy Council ("Agreed Statement").

Courtenay Decl., Ex. F.  In that Agreed Statement, the parties stipulated:

---

[3] The GOB was originally the defendant in the Belize Public Law Proceedings; however, during the course of the
litigation, political control of the government changed.  After this change, the GOB no longer defended the legality
of these agreements.  Declaration of Eamon H. Courtenay, dated October 16, 2014 ("Courtenay Decl.") Ex. F, ¶ 15.

It is common ground between the parties that the 2004 Guarantee was discharged by the Settlement Deed.  Therefore, Hafiz J [the Belize Supreme Court Judge] declined to consider whether the 2004 Guarantee was unlawful.

The [four original plaintiffs] did not pursue their initial claim that the Settlement Deed was unlawful.

Courtenay Decl., Ex. F ¶¶ 17-18.

The only challenge that the plaintiffs pursued in the Privy Council with respect to the Loan Note was that it violated Section 7 of the Finance and Audit (Reform) Act No. 12 of 2005. That statute provided that any "agreement, contract or other instrument" that effected a "borrowing or loan to the Government" would only be valid if entered into "pursuant to a resolution of the National Assembly authorizing the Government to raise the Loan or to borrow the money."  Courtenay Decl., Ex. F ¶ 10.[4]

The Privy Council (contrary to the lower courts in Belize) concluded that the Loan Note was not illegal.  The Judgment stated:

[T]he terms of the Settlement Deed and the Loan Note are clear.  The purpose of both was clearly set out in the recitals.  It was to settle the position as between the Bank and the government under the 2004 Guarantee, not under any later arrangement between the parties.  The amount due under the Guarantee was agreed to be BZ $33,545,820 and the purpose of the Settlement Deed was to discharge that liability and to release the Government from all future liabilities under it.

Courtenay Decl., Ex. E ¶ 28.  Furthermore, the Privy Council found that the Loan Note was a promissory note and there was no loan to or borrowing by the GOB.  As a result, the Judgment concluded that the "Loan Note was not invalid."  *Id*. at ¶ 47.  As a party to the Belize Public Law Proceedings, the GOB is bound by that final judicial determination.  Courtenay Decl. ¶ 15.

---

[4] The plaintiffs did not argue that the Loan Note was illegal under Section 114 of the Belize Constitution, although they could have.  That is undoubtedly because the Belize Constitution does not bar agreements or contracts by the government to borrow money without legislative authorization.  The Belize Constitution only requires legislative approval when money is "withdrawn from the Consolidated Reserve Fund."  Courtenay Decl. ¶ 10.

3

### 3.     The Belize Private Law Proceedings

In early 2008, the GOB and the Bank entered into the 2008 Settlement Agreement that resolved and terminated the 2007 Arbitration.  Kimmelman Decl., Ex. B ¶¶ 122, 133.  After the Belize elections in February 2008 and the formation of a new government, it is undisputed that the GOB commenced litigation in the Belize Supreme Court (Claim No. 228 of 2008) challenging the legality of certain aspects of the 2008 Settlement Agreement (the "Belize Private Law Proceedings").  Kimmelman Decl., Ex. B ¶ 155; GOB Motion at 4.  The Bank opposed this litigation on the ground that the dispute between the parties was subject to arbitration under Clause 9 of the Settlement Deed.  The parties sought and obtained antisuit injunctions from courts in England and Belize in support of their respective positions.  Kimmelman Decl., Ex. B ¶ 157.  The resulting impasse between the courts was resolved when the Belize Supreme Court granted the Bank's motion to stay the GOB's lawsuit in favor of arbitration in a decision dated July 4, 2008.  Kimmelman Decl., Ex. B ¶ 160.

The Belize Supreme Court concluded that there was a valid and enforceable arbitration agreement between the GOB and the Bank in Clause 9 of the Settlement Deed and stayed the GOB's lawsuit in favor of arbitration.  With respect to the threshold question of whether there was a valid arbitration agreement, the Belize Supreme Court stated:

> 41.     It is the case of the applicant [the Bank] that there is in fact and in law an arbitration agreement between it and the respondent, the Government of Belize. In support of this it relies on Clause 9 of the Settlement Deed and Loan Note of March 2007, executed between it and the Government of Belize. . . .
>
> 42.     The Solicitor General on behalf of the respondent [the GOB] graciously conceded that it was common ground that in the 2007 agreement between the parties there was an arbitration agreement.  But, she contended, that Clause 9 of that agreement did not extend to the funds from Venezuela, which are the subject of the substantive claim by the Government of Belize. . . .

Courtenay Decl., Ex. B ¶¶ 41-42.   Importantly, the GOB conceded the existence of the arbitration clause in the Settlement Deed and did not even argue that the Prime Minister lacked authority to enter into the arbitration clause or that the arbitration clause was not binding on the GOB.  The only argument the GOB made was that the arbitration clause did not extend to the GOB's specific claim (that a portion of the 2008 Settlement Agreement was invalid).  Based on the arguments presented, the Belize Supreme Court concluded that "there is subsisting between the parties a valid arbitration agreement contained in Clause 9 of the March 23rd 2007 Settlement Deed and Loan Note."  *Id*. ¶ 46.

The Belize Supreme Court also found that "the arbitration agreement in this case is not null and void" (*Id*. ¶ 48), "is not inoperative or incapable of being performed" (*Id*. ¶ 53), and the substantive claim at issue "is within the reference in Clause 9.2 of the arbitration agreement in this case."  *Id*. ¶ 64.

Therefore, the Belize Supreme Court found "a valid and existing arbitration agreement whose scope includes the dispute that is thrown up by the substantive claim of the Government of Belize in this matter."  *Id*. ¶ 65.  This decision is final and no longer appealable.  Courtenay Decl. ¶ 8.

### 4.        The 2008 Arbitration

Based on the Belize Supreme Court decision, the Bank commenced the 2008 Arbitration. In its request for arbitration, the Bank asserted alternative claims—enforcement of the 2008 Settlement Agreement or, alternatively, damages for breach of the Loan Note.  Kimmelman Decl., Ex. B ¶¶ 5-6.  The Bank nominated Hilary Heibron QC as its party-nominated arbitrator, just as it had in the 2007 Arbitration.  *Id*. ¶ 24.  The GOB again refused to nominate an arbitrator,

just as it had in the 2007 Arbitration. *Id.* ¶ 26.[5]  Pursuant to Article 7.2 of the LCIA Rules, the

LCIA again appointed Professor Zachary Douglas on behalf of the GOB. *Id.* ¶ 27.  The two

arbitrators then appointed Toby Landau QC as chairman (just as they had in the 2007

Arbitration). Kimmelman Decl., Ex. E ¶ 7.   The tribunal rendered a First Partial Award dated

August 4, 2009 ("First Partial Award"), in which the tribunal concluded that it had jurisdiction to

resolve the Bank's claims under the 2008 Settlement Agreement and also found that part of the

2008 Settlement Agreement was void.  Kimmelman Decl., Ex. B ¶¶ 227, 328.

On December 2, 2011, after the Privy Council issued its October 20, 2011 Judgment,

finding the Loan Note enforceable, the GOB wrote to the tribunal advising that "the Government

of Belize has decided to participate in these arbitral proceedings."  Kimmelman Second Decl.,

Ex. F.  The GOB did not reserve any rights or assert any defenses as to the arbitrability of the

dispute.

Both parties—the Bank and the GOB—made a joint proposal to the tribunal on

February 9, 2012, that included a representation that "[t]he parties are bound by the First Partial

Award dated 11 August 2011."  Kimmelman Second Decl., Ex. G.  Thereafter, on February 28,

2012 the GOB reiterated that "[o]f course the First Partial Award is in force," and on March 6,

2012 the GOB stated that the "[GOB] respects and is not contesting the First Partial Award."

Kimmelman Second Decl., Exs. H, I.  In doing so, the GOB was taking advantage of an

arbitration award rendered pursuant to the arbitration agreement in Clause 9 of the Settlement

Deed by a tribunal that included Professor Zachary Douglas.

After Mr. Landau resigned as president of the arbitral tribunal on February 24, 2012, the

GOB asserted various objections to the process by which the LCIA replaced the president of the

---

[5] Indeed the GOB consented to having the LCIA appoint an arbitrator on its behalf.  *See* Declaration of Louis B. Kimmelman, dated October 17, 2014 ("Kimmelman Second Decl."), Ex. T.

tribunal as well as to Professor Douglas's continued service on the tribunal.  These objections culminated in the GOB's filing of a formal challenge to both the constitution of the tribunal as well as to Professor Douglas on March 26, 2012 and also a challenge to the selection of the new president of the tribunal.  Kimmelman Second Decl., Exs. J, K.  The LCIA, in accordance with its Rules and its Constitution, appointed a three-person division to resolve the GOB's challenges. After the LCIA denied the GOB's challenges, the GOB refused to participate in the arbitration. Kimmelman Decl., Ex. A ¶¶ 24, 29.  On January 15, 2013, the tribunal rendered the Final Award.

## ARGUMENT

## I.   THE DISTRICT COURT HAS SUBJECT MATTER JURISDICTION TO CONFIRM THE FINAL AWARD

Respondent claims that this Court lacks subject matter jurisdiction because the arbitration exception to immunity, 28 U.S.C. §1605(a)(6), does not apply to this case for two reasons.  First, Respondent asserts that there is no agreement to arbitrate by the GOB because "the former Prime Minister who signed the subject agreements lacked actual authority to enter into the agreements." GOB Motion at 1.  Second, Respondent claims that the Convention does not apply to the Final Award because Belize is not a party to the Convention.  *Id*. at 18.  Both arguments are baseless.

### A.   The FSIA's Arbitration Exception to Sovereign Immunity Applies to Confirmation of the Final Award

Section 1605(a)(6) of the FSIA expressly denies a foreign state immunity from a suit "to confirm an award" if two elements are established.

First, the action must be brought to confirm an award made pursuant to "*an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration* all or any differences . . . with respect to a defined legal relationship . . . concerning a subject matter capable of settlement by arbitration under the laws of the United States."  28 U.S.C. § 1605(a)(6)

(emphasis added).  This element only requires the existence of "an agreement . . . to submit to arbitration" for the exception to apply.  *Id.*

Second, this exception to immunity applies "if . . . the agreement or award *is or may be governed* by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards."  28 U.S.C. § 1605(a)(6)(B) (emphasis added).  By its terms, this element is satisfied if an award *"is or may be* governed" by an applicable treaty.  *Id.* (emphasis added).  In other words, a *prima facie* showing is sufficient.

Both elements of the arbitration exception to immunity are satisfied in this case, and therefore, this Court has subject matter jurisdiction.

### 1.    The Arbitration Agreement Was Made by the GOB

The GOB claims that the arbitration agreement was not "made by" it, because the Prime Minister allegedly lacked "actual authority to execute the subject agreements, including the Settlement Deed that contained the arbitration clause" because legislative approval had not been obtained as required by Section 114 of the Belize Constitution.   GOB Motion at 11-12.  This argument fails for several independent reasons.

First, the GOB fully litigated the existence and validity of the arbitration agreement in the Settlement Deed in the Belize Private Law Proceedings.  In May 2008, the GOB filed Claim No. 228 of 2008 in Belize challenging certain aspects of the 2008 Settlement Agreement.  In response, the Bank asserted that the issues raised by the GOB were subject to arbitration under the arbitration agreement in Clause 9 of the Settlement Deed.  The parties litigated the enforceability of the arbitration agreement before the Belize Supreme Court.  Courtenay Decl. ¶ 7.  On July 4, 2008, the Belize Supreme Court issued a decision granting the Bank's application to stay the litigation in favor of arbitration.  In this decision, the Belize Supreme Court concluded:

> I therefore find and conclude that there is subsisting between the parties a valid arbitration agreement contained in Clause 9 of the March 23rd 2007 Settlement Deed and Loan Note.

Courtenay Decl., Ex. B ¶ 46.  That decision is final and binding on the GOB.  Courtenay Decl. ¶ 8.  As a result, the GOB is barred from relitigating these same issues again based on the doctrine of collateral estoppel or claim preclusion.

Collateral estoppel "bars relitigation of the same issues in successive lawsuits.  It applies 'when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'"  *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 334 (D.C. Cir. 2011) (citation and alterations omitted).[6]  This fundamental principle applies to foreign as well as domestic judgments.  *See Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 33 (D.D.C. 2007).  As a result, the GOB cannot relitigate the existence and validity of the arbitration agreement in the Settlement Deed.

Second, after the Belize Private Law Proceedings concluded and the 2008 Arbitration began, the GOB waived any possible objection that it might have had to the existence of the arbitration agreement in the Settlement Deed.  The LCIA Rules, expressly provide that the tribunal has "the power to rule on its own jurisdiction" and that a "plea by the Respondent that the Arbitral Tribunal does not have jurisdiction shall be treated as having been irrevocably waived unless it is raised not later than the Statement of Defence."  LCIA Rules, Arts. 23.1 and 23.2.  The GOB never asserted that the tribunal lacked jurisdiction based on the absence of a valid and binding arbitration agreement during the 2008 Arbitration.  Kimmelman Second Decl. ¶ 7.  In fact, the GOB expressly agreed that it was bound by the tribunal's First Partial Award.  Kimmelman Second Decl., Ex. I.  Having failed to object to the tribunal's jurisdiction and

---

[6] Here, both the Bank and the GOB were parties to the Belize Private Law Proceedings in which the Belize Supreme Court determined that the arbitration agreement in the Settlement Deed was valid and enforceable, this issue was fully litigated by the parties and the decision is final.

having accepted the tribunal's decision in the First Partial Award, the GOB waived any argument that it might have had with regard to the arbitration agreement. *See e.g.*, *Howard Univ. v. Metro. Campus Police Officers Union*, 512 F.3d 716, 720 (D.C. Cir. 2008) ("a party that does not object to the arbitrator's jurisdiction during the arbitration may not later do so in court.").

Third, the "agreement" that is the basis for a waiver of immunity under Section 1605(a)(6) of the FSIA is the "agreement . . . to submit to arbitration," *not* the Settlement Deed as a whole or any other agreement.  The GOB presented no evidence to suggest that the Prime Minister lacked authority to agree to an arbitration agreement on behalf of the GOB.  In fact, the GOB presented authority to the contrary.  In *BCB Holdings Ltd. v. The Attorney Gen. of Belize*, [2013] CCJ 5 (AJ), a case that the GOB relies on, the Caribbean Court of Justice, which is now the highest appellate court for Belize, confirmed the Prime Minister's power:

> We agree that the Minister does indeed possess wide prerogative powers to enter into agreements.  The Executive may do so even when those agreements require legislative approval before they can become binding on the State.

Courtenay Decl., Ex. D ¶ 38.

Fourth, although the validity of the guarantee, the Settlement Deed and the Loan Note are irrelevant to the existence of an arbitration agreement under Section 1605(a)(6) of the FSIA, the GOB is barred from even making these arguments.  During the Belize Public Law Proceedings, the parties, including the GOB, stipulated that the 2004 guarantee was discharged by the Settlement Deed and, as a result, the trial court did not "consider whether the 2004 Guarantee was unlawful."  Courtenay Decl., Ex. F ¶ 17.  Furthermore, the plaintiffs did not pursue their initial claim that "the Settlement Deed was unlawful."  *Id*.  As a result, the Privy Council concluded that the Loan Note "was not invalid."  Courtenay Decl., Ex. E ¶ 47.

Under basic principles of *res judicata* or claim preclusion, the GOB is now precluded from relitigating the validity of any of the contracts that were challenged in the Belize Public

10

Law Proceedings.  *See Porter v. Shah*, 606 F.3d 809, 813 (D.C. Cir. 2010) ("Under the doctrine

of *res judicata*, or claim preclusion, a subsequent lawsuit will be barred if there has been prior

litigation (1) involving the same claims or cause of action, (2) between the same parties or their

privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent

jurisdiction"); *Int'l Trading and Indus. Inv. Co. v. Dyn-Corp Aerospace Tech.*, 763 F. Supp. 2d

12, 24 (D.D.C. 2011) ("Res judicata effect has . . . traditionally been afforded foreign country

judgments entitled to recognition consistently with principles of comity.") (internal quotation and

citation omitted).  The GOB litigated with the Bank the legality of the guarantee, Settlement

Deed and Loan Note in the Belize Public law Proceeding and is barred from relitigating these

same claims now.[7]

Finally, the GOB failed to satisfy its burden of establishing that it had not made the

"agreement . . . to submit to arbitration."  *Gulf Res. Am., Inc. v. Republic of Congo*, 370 F.3d 65,

70 (D.C. Cir. 2004) ("[T]he defendant bears the burden of proving that the plaintiff's allegations

do not bring its case within a statutory exception to immunity.").  The GOB has submitted the

declarations of two witnesses who state, without citing any legal authority, assert that the Prime

Minister "lacked actual authority" to sign the guarantee, Settlement Deed and Loan Note because

he needed "approval of the National Assembly" pursuant to Section 114 of the Belize

Constitution.  Waight Decl. ¶ 8; Gandhi Decl. ¶ 5.  However, the plain language of Section 114

of the Belize Constitution does not impose any requirement that agreements entered into by the

government require prior legislative approval; it only prohibits "moneys" from being

---

[7] The GOB argues that the Privy Council never considered the specific issue that the GOB raises here, namely whether the Settlement Deed and Loan Note violated Section 114 of the Belize Constitution.  GOB Motion at 14.  It is apparent from the judgment that the plaintiffs did not make this argument.  Under Belize law, the parties challenging the legality of the Settlement Deed and Loan Note were required to raise all arguments with regard to the validity of these contracts in the Belize Public Law Proceedings.  Courtenay Decl. ¶ 6.  As a result, the Privy Council decision resolving the legality of the Settlement Agreement and Loan Note is res judicata, and the GOB cannot now make arguments that could have been made before. Courtenay Decl. ¶¶ 14-15.

"withdrawn" without legislation.  Gandhi Decl. ¶ 4; Courtenay Decl. ¶ 10.  Moreover, the recent

Caribbean Court of Justice opinion relied on by the GOB refutes the GOB's assertion that the

Prime Minister lacked authority to agree to an arbitration provision.  Courtenay Decl., Ex. D

¶ 38.  The GOB has failed to carry its burden.[8]

### 2.  The GOB's Argument Is Based on a Misreading of the FSIA

The GOB suggests that Petitioner seeks to apply FAA law, rather than FSIA law, to

determine whether the arbitration exception applies in this case.  GOB Motion at 14-15.  This is

incorrect.  Petitioner relies on the arbitration exception in Section 1605(a)(6) of the FSIA without

reference to the FAA or federal arbitration law.  That exception depends on whether an

"agreement . . . to submit to arbitration" exists, which is clearly the case here.  28 U.S.C.

§ 1605(a)(6).

Moreover, the GOB's suggestion that the phrase "agreement . . . to submit to arbitration"

as used in the FSIA somehow makes the Settlement Deed as a whole relevant to the FSIA

inquiry is contrary to the statutory language.  Congress could have based the arbitration

exception to immunity on the parties' contract as a whole, but did not.  It chose instead to tie the

immunity exception solely to the existence of an agreement to arbitrate.

---

[8] The GOB's reliance on the Ninth Circuit decision in *Phaneuf v. Republic of Indonesia*, 106 F.3d 302 (9th Cir. 1997), is misplaced.  In *Phaneuf*, the court considered whether the commercial activity exception to immunity, 28 U.S.C. § 1605(a)(2), applied to the facts of a case based on the actions of an agent of Indonesia.  The issue was whether the agent needed to have actual authority for the exception to apply, or whether apparent authority sufficed. The Ninth Circuit concluded that actual authority was needed.  106 F.3d at 308.  Although the Fourth Circuit followed the Ninth Circuit in holding that evidence of actual authority is required, *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 399-400 (4th Cir. 2004), other circuits have concluded that evidence of apparent authority is sufficient for there to be an exception to immunity.  *See First Fidelity Bank, N.A. v. Gov't of Antigua & Barbuda*, 877 F.2d 189, 200 (2d Cir. 1989) (an agent with "apparent authority [may] bind [the sovereign]"); *see also Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1299 (11th Cir. 1999) (applying *First Fidelity Bank* and holding that "courts should assume that an ambassador possesses the authority to . . . waive sovereign immunity").  Regardless of which standard might apply, the GOB has failed to meet its burden of establishing that the Prime Minister lacked either actual or apparent authority to enter into an arbitration agreement on behalf of the GOB.  *Gulf Res. Am.*, 370 F.3d at 70.

The language Congress chose to use in the FSIA is very similar to the phrase "agreement in writing . . . to submit to arbitration" as used in Article II(1) of the Convention and the phrase "arbitration agreement" as used in Section 202 of the FAA. This is not surprising. When Congress amended the FSIA to add Section 1605(a)(6) in 1988,[9] it did so against a backdrop of federal law in which these words had a well recognized meaning—an arbitration agreement that is separate and distinct from the contract in which it is contained. *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) (differentiating between "the agreement to arbitrate" and "the contract generally."). Therefore, the arbitration agreement requirement of Section 1605(a)(6) of the FSIA is satisfied.

### 3. The Convention Applies to the Final Award

The GOB also argues that the Convention does not apply to the Final Award. GOB Motion at 18. It offers two arguments, both of which are incorrect.

First, the GOB argues that the Convention cannot apply here "because Belize has not ratified it." GOB Motion at 18. The D.C. Circuit has already rejected this argument. In *Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 n.3 (D.C. Cir. 2012), the Court of Appeals held that it is the place where the award was rendered, not the parties to the award, that determines whether the Convention applies. The court stated:

> The fact that Belize is not a party to the New York Convention is irrelevant. If the place of the award is "in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration." *Creighton Ltd. v. Gov't of the State of Qatar,* 181 F.3d 118, 121 (D.C. Cir. 1999). The Award was rendered in London, and BSDL seeks enforcement in the United States; both England and the United States are parties to the New York Convention.

---

[9] Act of Nov. 16, 1988, Pub. L. No. 100-669, § 2, 102 Stat. 3969.

Whether Belize is a party to the Convention is irrelevant under Chapter 2 of the FAA. An arbitral award rendered in a Convention state (Great Britain) has been presented for enforcement in the United States (another Convention). It is the treaty obligation of the United States, as the place of enforcement, that controls. That obligation, as set forth in Section 207 of the FAA, requires the United States to enforce the Final Award.

Second, the GOB argues that the Convention does not apply to the GOB because it is not a "person" under the Convention. GOB Motion at 19-20. This is based on a misreading of the Convention and the U.S. implementing legislation.

Article I(1) of the Convention states that the Convention shall apply to awards arising out of differences between "persons, whether physical or not." The leading commentator on the Convention, Professor Albert Jan van den Berg, has rejected the suggestion that this language does not cover foreign states:

> Although the text of the New York Convention does not contain an express provision regarding the capacity of a State to enter into an arbitration agreement, the expression in Article I(1) "*differences between persons, whether physical or legal*" was inserted in the Convention on the understanding that an arbitration agreement and an arbitral award to which a State is a party are not excluded from the ambit of the Convention.

Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation (1981) at 279 (emphasis in original).

This reading of the Convention is consistent with the U.S. implementing legislation. In Section 202 of the FAA, Congress provided that the Convention applies to awards and agreements to arbitrate "arising out of a legal relationship . . . which is considered as commercial." 9 U.S.C. § 202. Congress imposed no restrictions on the types of parties to these relationships. Therefore, the Convention applies in the U. S. to all parties, including a foreign state such as the GOB, where there is a commercial relationship, such as the Settlement Deed.

Therefore, the Bank has established that the Final Award "is or may be governed" by the Convention pursuant to Section 1605(a)(6) of the FSIA.

### B.     The GOB Waived Its Foreign Sovereign Immunity

In addition to the arbitration exception to immunity, a foreign state is not entitled to sovereign immunity if "the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  The GOB expressly and irrevocably waived its immunity with respect to its obligations under the Settlement Deed.  Kimmelman Decl., Ex. C Clause 9.5.  That explicit waiver of immunity from legal proceedings satisfies the FSIA.  28 U.S.C. § 1605(a)(1).  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 n.13 (D.C. Cir. 2002) (immunity waived where contract stated "In respect of any arbitration or legal action or proceedings arising out of or in connection with this Agreement, … [the Kazakhstan State Committee] hereby irrevocably agrees not to claim and hereby irrevocably waives … immunity for itself and the assets of the Republic of Kazakhstan . . . .").

The GOB argues that "there is no waiver of foreign sovereign immunity by GOB because . . . the former Prime Minister lacked actual authority to execute the Settlement Deed, which renders the entire Settlement Deed (including its Clause 9.5) void *ab initio*."  GOB Motion at 21-22.  This argument is baseless.  First, a challenge to the Settlement Deed was made in the Belize Public Law Proceedings to which the GOB was a party.  During the course of that proceeding, the plaintiffs "did not pursue their initial claim that the Settlement Deed was unlawful."  Courtenay Decl., Ex. F ¶ 18.  As a result, the Privy Council did not address this issue.  Any claim by the GOB now that could have been but was not raised with respect to the enforceability of the Settlement Deed is barred by the doctrine of *res judicata* or claim preclusion.  Courtenay Decl. ¶ 15.  *See also Consolidated Edison Co. of NY, Inc. v. Bodman*, 445 F.3d 438, 450 (D.C. Cir. 2006) (stating that "claim preclusion [is] really a rule against claim splitting" and that claim

preclusion "'generally binds parties from litigating or relitigating any [claim] that was or could have been litigated in a prior adjudication and prevents claim splitting'") (*quoting Gener-Villar v. Adcom Group, Inc.*, 417 F.3d 201, 205 (1st Cir. 2005)); *Int'l Trading*, 763 F. Supp. 2d at 24 ("Res judicata effect has . . . traditionally been afforded foreign country judgments entitled to recognition consistently with principles of comity.") (quoting *Guinness PLC v. Ward*, 955 F.2d 875, 893 n.14 (4th Cir. 1992)).

Second, even if the Belize Public Law Proceedings do not bar the GOB's argument, the GOB has failed to satisfy its burden of demonstrating that the Prime Minister lacked authority to execute the Settlement Deed absent legislation under Section 114 of the Belize Constitution. *Gulf Res. Am., Inc.*, 370 F.3d at 70. As discussed above, the language of Section 114 of the Belize Constitution as well as the recent case law of the Caribbean Court of Justice do not support the GOB's argument. Courtenay Decl. ¶¶ 10, 11.

Thus, the GOB waived its sovereign immunity in this case under Sections 1605(a)(6) and 1605(a)(1) of the FSIA, and this Court has subject matter jurisdiction under 28 U.S.C. § 1330(a).

## II.    **THIS COURT CANNOT DISMISS THE PETITION UNDER THE DOCTRINE OF FORUM NON CONVENIENS**

The GOB argues that the Court of Appeals' decision in *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), does not control and that this Court should dismiss this award enforcement proceeding under the doctrine of *forum non conveniens*. However, controlling D.C. Circuit law and the express terms of the FAA preclude this argument.

### A.    **The D.C. Circuit Has Held That There Is No Adequate Alternative Forum in an Award Enforcement Proceeding**

A party invoking the doctrine of *forum non conveniens* must make a threshold showing before there can be any balancing of public and private convenience factors. This is because a *forum non conveniens* "dismissal would not be appropriate where the alternative forum does not

permit litigation of the subject matter of the dispute." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235,

254 n.22 (1981).  The GOB had failed to satisfy this threshold "burden of proving that there is an

adequate alternative forum."  *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir.

1996), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Mercier v.

Sheraton Int'l, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991).

In *TMR Energy*, the D.C. Circuit recognized that "only a court of the United States (or of

one of them) may attach the commercial property of a foreign nation located in the United

States" in a Convention award enforcement proceeding.  411 F.3d at 303.  Whether there is

property already identified is of no moment—the D.C. Circuit recognized that "[e]ven if the

[judgment debtor] currently has no attachable property in the United States, however, it may own

property here in the future, and [the petitioner]'s having a judgment in hand will expedite the

process of attachment.  In any event, the possibility that the judgment of the district court may go

unenforced does not bear upon whether that court is an inconvenient forum in which to defend."

*Id.*  Because no other forum could attach property located in the United States, no other forum

could be adequate, and dismissal on *forum non conveniens* grounds would not be appropriate.

*Id.* at 304.  *TMR* is controlling law of this circuit, and therefore the GOB's motion should be

denied. [10]

The GOB asserts that *TMR Energy* conflicts with Supreme Court precedent stating that a

*forum non conveniens* analysis requires a balancing of factors.  *See* GOB Motion at 23 (citing

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007)).  There is no

conflict between *TMR Energy* and any Supreme Court precedent.  The D.C. Circuit has

---

[10] The GOB's reliance on the Second Circuit decisions in *Figueiredo Ferraz E Engenharia de Projecto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011), and *In re Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002), is misplaced.  Those decisions are in conflict with the D.C. Circuit decision in *TMR Energy*.

explained that before the balancing of any factors under the doctrine of *forum non conveniens*, Supreme Court precedent requires the district court first to determine "whether an adequate alternative forum for the dispute is available." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)).  The *TMR Energy* decision addresses this threshold element of the *forum non conveniens* analysis and remains controlling law.

### B.    The Convention Does Not Permit a Forum Non Conveniens Dismissal

Apart from the decision in *TMR Energy*, applying the doctrine of *forum non conveniens* in this case would be inconsistent with the Convention.  Section 207 of the FAA requires that any court hearing a petition for enforcement a Convention award "*shall confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207 (emphasis added); *Belize Social Dev. Ltd.*, 668 F.3d at 727.  The doctrine of *forum non conveniens* is not enumerated as one of the Article V defenses to enforcement under the Convention.  Accordingly, a *forum non conveniens* dismissal is foreclosed by Section 207 of the FAA.

This circuit has emphasized that the limitations defined in Section 207 of the FAA "affords the district court *little discretion* in refusing or deferring enforcement of foreign arbitral awards: the Convention is 'clear' that a court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.'"  *Belize Social Dev. Ltd.*, 668 F.3d at 727 (emphasis added) (quoting *TermoRio S.A., E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007)).[11]  Because the doctrine of *forum non conveniens* is "not . . . a ground set forth

---

[11] Nor can a dismissal based on *forum non conveniens* be justified based on Article III of the Convention, which provides that awards will be enforced "in accordance with the rules of procedure of the territory where the award is relied upon."  N.Y. Convention art. III.  Article III subjects any such local procedure to "the conditions laid down in the following articles."  *Id.*  These conditions provide that the exclusive grounds for non-enforcement of an award

in the New York Convention," such a dismissal would not be permissible under the FAA. *See id.* at 731. This interpretation of the Convention is supported by the Restatement (Third) of International Commercial Arbitration which states that "[a]n action to . . . enforce a foreign Convention award is not subject to a stay or dismissal in favor of a foreign court on *forum non conveniens* grounds." Restatement (Third) of Int'l Comm. Arb. § 4-29(a) (Tentative Draft No. 2, 2012).

There is no basis to dismiss this award enforcement proceeding based on the doctrine of *forum non conveniens.*

## III.    THERE IS NO BASIS TO DISMISS THE PETITION FOR LACK OF PERSONAL JURISDICTION

The GOB recognizes that under the controlling law of this circuit, "foreign states are not 'persons' protected by the Fifth Amendment," and therefore they are not entitled to the due process guarantee of minimum contacts with the forum as a prerequisite to personal jurisdiction. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002). Instead, the GOB offers arguments as to why the law is incorrect or should be changed. GOB Motion at 26-30. However, this Court must abide by the controlling law of this circuit and deny the jurisdictional challenge.

The D.C. Circuit has repeatedly and consistently held that "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012). The Court of Appeals has stated a simple rule that "under the FSIA, subject matter jurisdiction plus service of process equals

---

are in Article V of the Convention. *Belize Social Dev. Ltd.*, 668 F.3d at 727. Thus, Article III cannot expand the grounds for non-enforcement of an award that are exclusively defined in Article V of the Convention.

personal jurisdiction." *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) (internal quotation and citation omitted).[12]

The GOB claims that it would be inappropriate to afford foreign states less protection under the Due Process Clause than foreign corporations. GOB Motion at 27. On the contrary, the D.C. Circuit recognized that there are powerful reasons for treating foreign states differently. "[S]overeign states interact with each other through diplomacy and even coercion in ways not affected by constitutional protections such as the Due Process Clause." *Nat'l Council of Resistance of Iran v. Dep't of State,* 251 F.3d 192, 202 (D.C. Cir. 2001). Whereas a foreign corporation has no recourse if U.S. courts accept jurisdiction over it, a foreign sovereign has political options. Not only can a foreign sovereign better protect itself against the improper exercise of jurisdiction, but extending the protections of due process to foreign states would severely harm "the flexibility and discretion of the political branches in conducting this country's relations with other nations." *Price*, 294 F.3d at 97. For instance, "the power of Congress and the President to freeze the assets of foreign nations, or to impose economic sanctions on them, could be challenged as deprivations of property without due process of law." *Id.* at 99.

Likewise, this circuit has rejected the GOB's argument (GOB Motion at 28-29) that implicit in the theory of international relations underlying the FSIA is some notion of due process.[13] *TMR Energy Ltd.*, 411 F.3d at 302. On the contrary, the FSIA "clearly expresses the decision of the Congress to confer upon the federal courts personal jurisdiction over a properly

---

[12] The GOB does not dispute that service of process in this case was proper. Dkt. No. 9 ("Respondent hereby accepts service of process of the Petition (ECF-1) through its undersigned counsel.").

[13] To the extent the GOB relies on the original legislative history of the FSIA for this due process argument, the GOB ignores the fact that the arbitration exception to immunity was added to the FSIA in 1988 and therefore is not addressed in the earlier legislative history.

served foreign state . . . coextensive with the exceptions to foreign sovereign immunity in the FSIA." *Id.* at 303.[14]

Under controlling D.C. Circuit law, this Court has personal jurisdiction over the GOB.

## IV.   THERE IS NO BASIS TO DISMISS BASED ON THE DOCTRINE OF INTERNATIONAL COMITY

The GOB also argues that this award enforcement proceeding should be dismissed based on the doctrine of international comity "in deference to the [Caribbean Court of Justice] decision."  GOB Motion at 30-33.  The Caribbean Court of Justice ("CCJ") decision referred to is *BCB Holdings Ltd.*, a case involving different parties with a claim against the GOB under a different contract that was resolved in a different arbitration.  The issue in that case was whether to enforce an arbitration award *in Belize*.

The GOB's comity argument is foreclosed by D.C. Circuit law and by the language of the FAA.  The D.C. Circuit has emphasized that the "plain terms" of Section 207 "instruct a district court reviewing a foreign arbitral award to 'confirm the award unless it *finds* one of the grounds for refusal or deferral of recognition or enforcement . . . specified in the [New York] Convention.'"  *Belize Social Dev. Ltd.,* 668 F.3d at 733 (quoting 9 U.S.C. § 207) (emphasis in original); *see also Swiss Inst. of Bioinformatics v. Global Initiative on Sharing All Influenza Data*, No. 13-1274, __ F.3d __, 2014 WL 2810500, at *3 (D.D.C. Jun. 23, 2014) ("A federal district court *shall* confirm an arbitral award that falls under the New York Convention unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.") (emphasis in original) (citation and internal quotations

---

[14] The GOB's reliance on *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 188 (D.C. Cir. 1999), (GOB Motion at 29-30), is misplaced since the assumption made in Creighton that foreign states are entitled to due process was overruled in *Price*, 294 F.3d at 96.

omitted).  Just as with the doctrine of *forum non conveniens*, there is no basis in the Convention to refuse or defer enforcement based on the doctrine of international comity.

The GOB urges that the Court should "abstain and dismiss based on international comity" even if the Convention itself does not provide a ground to do so.  GOB Motion at 32. This Court has emphasized that the FAA "affords the district court little discretion in refusing or deferring the enforcement of foreign arbitral awards."  *Belize Social Dev. Ltd.*, 668 F.3d at 727. The discretion to refuse confirmation is limited "only" to the grounds "explicitly set forth in Article V of the Convention."  *Id*. (quoting *TermoRio*, 487 F.3d at 935).

Finally, the GOB's argument must be rejected because it is based on a fundamental misunderstanding of the Convention award enforcement process.  Multiple award enforcement proceedings in different jurisdictions are not unusual and do not present a "true conflict."  In fact, "multiple judicial proceedings on the same legal issues are characteristic of the confirmation and enforcement of international arbitral awards under the Convention."  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003). "[P]arties may bring suit to enforce awards notwithstanding the existence of ongoing proceedings. elsewhere."  *Steel Corp. of Philippines v. Int'l Steel Servs., Inc.*, 354 F. App'x 689, 694 (3d Cir. 2009); *see* Fed. R. App. P. 32.1.  The Convention envisions that enforcement jurisdictions may also reach different conclusions as to enforcement of an award since the exceptions to enforcement in Articles V(2)(a) and (b) are based on the law of the state in which enforcement is sought.  Therefore, consistent with the Convention, award enforcement proceedings may be brought in several jurisdictions.  The doctrine of comity is not a basis for dismissing this award enforcement proceeding

**V.      THE GOVERNMENT OF BELIZE HAS FAILED TO ESTABLISH A
CONVENTION DEFENSE TO ENFORCEMENT OF THE AWARD**

The Convention provides "a carefully crafted framework for the enforcement of
international arbitral awards." *TermoRio*, 487 F.3d at 935.  It differentiates between the country
with primary jurisdiction over an award (*i.e.*, the power to vacate or set aside) and countries with
only secondary jurisdiction (*i.e.*, the power to enforce).  Based on this difference it is recognized
that

> The Convention mandates very different regimes for the review of arbitral awards
> (1) in the state in which, or under the law of which, the award was made, and (2)
> in other states where recognition and enforcement are sought.  The Convention
> specifically contemplates that the state in which, or under the law of which, the
> award is made, will be free to set aside or modify an award in accordance with its
> domestic arbitral law and its full panoply of express and implied grounds for
> relief.  See Convention art. V(1)(e).  However, the Convention is equally clear
> that when an action for enforcement is brought in a foreign state, the state may
> refuse to enforce the award on the grounds explicitly set forth in Article V of the
> Convention.

*TermoRio*, 487 F.3d at 935 (*quoting Yusuf Ahmed Alghanim & Sons. v. Toys "R" Us, Inc.*, 126
F.3d 15, 23 (2d Cir. 1997)).

Although England has primary jurisdiction over the Final Award because London was the
place of arbitration, the GOB has not sought to set aside or vacate the award in London under the
English Arbitration Act 1996.  Kimmelman Second Decl. ¶ 12.[15]  In contrast, the United States is
a secondary jurisdiction and must enforce the award unless an Article V defense is established.

The grounds for non-enforcement of an arbitral award under Article V of the Convention
are limited and narrowly construed, and the party challenging the award has the burden of
establishing the defense.  *TMR Energy*, 411 F.3d at 304 (Article V of the Convention "assigns
the burden of persuasion to the party opposing enforcement").  The GOB has asserted four

---

[15] Under Section 24 of the English Arbitration Act, the GOB could have sought to have the English court remove an
arbitrator on various grounds, including "justifiable doubts as to his impartiality."  Furthermore, under Section 68,
the GOB could have challenged the Final Award on various procedural grounds.  Kimmelman Second Decl., Ex. N.

defenses to enforcement of the Final Award.  First, that the composition of the tribunal was not

in accordance with the parties' agreement.  Second, that the Final Award violated U.S. public

policy.  Third, that the arbitration violated due process.  Finally, that the agreement to arbitrate

was invalid.  The GOB has failed to carry its burden as to each of these defenses.

A.      **The Arbitral Tribunal Was Composed In Accordance with the LCIA Rules
and the Parties' Arbitration Agreement**

The GOB argues that the composition of the arbitral tribunal was not in accordance with

the parties' agreement based on (1) the LCIA's decision to deny the GOB's request to

reconstitute the tribunal, and (2) the LCIA's refusal to remove Professor Zachary Douglas.  GOB

Response at 1.  The GOB argues that in reaching these decisions, the LCIA "[b]lind[ed] itself to

the LCIA's own procedural rules and to international law," (*id.*), and that this Court should

therefore refuse enforcement under Article V(1)(d) of the Convention.

The record demonstrates that the Respondent's assertion is false—the LCIA followed the

procedures that the parties agreed would govern their dispute.  The GOB was given full

opportunity to present its procedural challenges to the LCIA Court, and the LCIA Court properly

resolved those issues in accordance with rules agreed to by the parties.  Accordingly, there is no

merit to the GOB's claimed Article V(1)(d) defense.

1.      **New York Convention Standard**

Article V(1)(d) of the Convention allows a court to refuse recognition and enforcement of

an award if "[t]he composition of the arbitral authority or the arbitral procedure was not in

accordance with the agreement of the parties, or, failing such agreement, was not in accordance

with the law of the country where the arbitration took place . . . ."  Convention Art. V(1)(d).

This provision "is intended to place outer limits on arbitrators' otherwise considerable powers to

manage proceedings" and applies only where the tribunal "fails to comply with the procedures

agreed upon by the parties." Restatement (Third) U.S. Law of International Commercial Arbitration ch. 4, Subtopic a (Tentative Draft No. 2, 2012). *See also Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 90-91 (2d Cir. 2005) (denying enforcement under Article V(1)(d) where arbitral institution appointed chairman  prior to disagreement of party-nominated arbitrators, as required by parties' agreement).[16]

Courts have also recognized that not all procedural violations should result in non-enforcement.  In *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, Civ. A. No. 90-0169, 1992 WL 122712 (D.D.C. May 29, 1992), this court stated that Article V(1)(d) was not intended "to permit reviewing courts to police every procedural ruling made by the Arbitrator and to set aside the award if *any* violation of [arbitral] procedures is found" because "[s]uch an interpretation would directly conflict with the 'pro-enforcement' bias of the Convention and its intention to remove obstacles to confirmation of arbitral awards."  *Id.* at *5 (citations omitted). Given the strong preference for enforcement, a court should set aside an award based on a procedural violation "only if such violation worked *substantial prejudice* to the complaining party."  *Id.* (emphasis added).  *See also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 190 F. Supp. 2d 936, 945 (S.D. Tex. 2001) (adopting *Hammermills* as "well-reasoned" and "hold[ing] that Pertamina must show that there is a violation of an arbitration agreement between the parties and that the violation actually caused Pertamina substantial prejudice in the arbitration").

---

[16] Professor van den Berg explains in his leading treatise on the Convention that

> in the case of an agreement of the parties on the composition of the arbitral tribunal, it rarely occurs that the tribunal is not constituted in accordance with their agreement.  As far as the agreement on the arbitral procedure is concerned, which agreement is usually embodied in Arbitration Rules of a specific arbitral institution, such an agreement generally affords wide discretionary powers to arbitrators as to the conduct of the arbitral procedure.  It therefore rarely happens that the arbitral procedure has not been conducted in accordance with the agreement of the parties.

Albert Jan van den Berg, The New York Arbitration Convention of 1958, 323 (1981).

It is undisputed that the parties agreed to arbitrate in accordance with the LCIA Rules.[17] *See* Declaration of Juan C. Basombrio dated August 8, 2014 ("Basombrio Decl.") ¶ 4.  When arbitration rules are referenced in an arbitration agreement, the parties are deemed to have made those rules part of their agreement and are bound by those rules.  *See Bryson v. Gere*, 268 F. Supp. 2d 46, 52-53 (D.D.C. 2003) (holding that "[r]eference to rules in the [arbitration] clause effectively incorporates those rules in their entirety into the Agreement" and provides "imputed consent" to be bound by arbitral rules); *Int'l Tech. Integration, Inc. v. Palestine Liberation Org.*, 66 F. Supp. 2d 3, 11 (D.D.C. 1999) ("By agreeing to arbitrate under the aegis of the AAA, [the parties] incorporated into their Agreement the AAA's Commercial Arbitration Rules.").

Where there is any question regarding an arbitral institution's rules, courts defer to the arbitral institution's interpretation of its own rules.  *See York Research Corp. v. Landgarten*, 927 F. 2d 119, 123 (2d Cir. 1991) ("Given the parties' designation of the AAA as the supervisory authority regarding the resolution of disputes under the agreement, the AAA's view of the meaning of its rules is of considerable significance."); *HBK Sorce Fin. v. Ameriprise Fin. Servs.*, No. 4:10-cv-02284, 2012 WL 4505993, at *5-6 (N.D. Ohio Sept. 28, 2012) (stating that "a court should defer to an arbitrator's interpretation of the agreement and arbitration rules").

The issue under Article V(1)(d) is whether the rules and procedures agreed to by the parties were followed, not whether the court would reach the same conclusion as the arbitral institution or the tribunal.  Such deference to an arbitral institution's or arbitral tribunal's procedural decisions follows from the parties' agreement and furthers the goals of efficient dispute resolution and finality of arbitral awards.  *See AO Techsnabexport v. Globe Nuclear Servs. and Supply*, 656 F. Supp. 2d 550, 556 (D. Md. 2009) ("The confirmation process does not

---

[17] A copy of the LCIA Rules is attached as Ex. M to the Kimmelman Second Decl.

give the opposing party another bite at the apple to re-litigate all the issues that were properly presented to and decided by the arbitral tribunal.").

## 2. The Formation of the Arbitral Tribunal

The arbitral tribunal in this case was formed in accordance with the LCIA Rules.  As in the parties' 2007 Arbitration, the GOB failed to nominate an arbitrator at the commencement of the 2008 Arbitration.  As a result, the GOB "irrevocabl[y] waive[d]" its right to nominate an arbitrator.  LCIA Arbitration Rules Art. 2.3.  The LCIA again appointed Professor Douglas as arbitrator on GOB's behalf pursuant to Articles 5.4, 5.5, and 7.2 of the LCIA Rules.  Kimmelman Decl., Ex. B ¶ 27.  Consistent with Clause 9.2 of the parties' agreement, Professor Douglas and the Bank's nominee, Ms. Hilary Heilbron QC, then nominated Toby Landau QC as chair of the tribunal.  Kimmelman Decl., Ex. E ¶¶ 6-7.

When Mr. Landau resigned as president of the arbitral tribunal on February 24, 2012, the LCIA had "complete discretion" under Article 11.1 of the LCIA Rules to allow the existing arbitrators, Professor Douglas and Ms. Heilbron, to select a replacement chair as they had selected the prior chair.  *See* LCIA Arbitration Rules Art. 11.1.  That is what the LCIA did.  The new chair, Mr. Yves Fortier, was appointed under the original nominating process used by the LCIA.  That process complied with the LCIA Rules—a process that the GOB both consented to and explicitly approved.  *See Bryson*, 268 F. Supp. 2d at 52-53; *Int'l Tech. Integration, Inc.*, 66 F. Supp. 2d at 11.

## 3. The GOB's Challenges to the Tribunal

After Mr. Landau's withdrawal, on February 27, 2012, the GOB requested that the LCIA Court reconstitute the entire arbitral tribunal "following the original nomination process" contained in the parties' agreement and allow the GOB to nominate a new arbitrator.  Kimmelman Second Decl., Ex. O.  The LCIA denied this request on February 29, 2012.  In its

decision, the LCIA Court stated that the GOB waived its right to nominate an arbitrator under

Article 2.3 of the LCIA Rules, and that the LCIA Court was authorized to appoint Professor

Douglas on the GOB's behalf.  As the LCIA Court explained:

> Pursuant to the arbitration clause, the parties were entitled to nominate one arbitrator each.  However, by failing to nominate an arbitrator within the 30-day period stipulated by Article 2.3 of the LCIA Rules, the [GOB] waived its right to nominate an arbitrator.  In this context, Zachary Douglas was selected by the LCIA Court on [the GOB's] behalf.

Kimmelman Second Decl., Ex. P.

On March 26, 2012, the GOB submitted a request for reconsideration of the LCIA

Court's decision not to reconstitute the tribunal.  *See* Kimmelman Second Decl., Ex. J.  In that

submission, the GOB also formally challenged Professor Douglas under Articles 5.3 and 10.3 of

the LCIA Rules, despite previously suggesting that Professor Douglas be the chair of the

tribunal.  *See id.*, Ex. J at 28, 32.  The GOB asserted that Professor Douglas lacked impartiality

and independence and should be disqualified.  *See id.*, Ex. J at 2.  Although the GOB did not

contend that Professor Douglas was in any way impartial, the GOB argued that the

representations of other members of the barristers' chambers of which he was a member (Matrix

Chambers) should be imputed to Professor Douglas and created an appearance of partiality.  *See*

Kimmelman Decl., Ex. E ¶ 53.

Specifically, the GOB contended that Professor Douglas lacked impartiality because (1)

other members of Matrix Chambers have been adverse to the GOB in prior litigations in which

Professor Douglas had no involvement; and (2) other members of Matrix Chambers had advised

Lord Michael Ashcroft, whose interests included the Bank, in matters wholly unrelated to the

parties' dispute.  *See* Kimmelman Second Decl., Ex. J at 13-15.  The GOB asserted that Article

5.3 of the LCIA Rules required Professor Douglas to respond to 30 questions seeking details

about the activities of other barristers in Matrix Chambers.[18]  However, Professor Douglas had

made clear that the rules governing barristers' independence do not allow barristers to share

information about their respective practices.  Thus, as he explained, the scope of his conflicts

check

> was and remains limited to my own practice as a sole practitioner.  I have never
> inquired as to the practice of other members of Matrix Chambers and I am under
> no obligation to do so.  No member of a barristers' chambers is obliged to provide
> details of his or her practice to another member of chambers and, unless such
> details are a matter of public record, *it would be a breach of a barrister's
> obligation of confidentiality to do so and would amount to professional
> misconduct.*

Kimmelman Second Decl., Ex. Q (emphasis added).

The Bank filed its opposition to the GOB's challenge on April 10, 2012.  Kimmelman

Second Decl., Ex. K.  On that same date, the GOB filed a challenge under Articles 10.1 and 10.4

of the LCIA Rules to the manner of the selection of Mr. Fortier as replacement chair of the

tribunal.  Kimmelman Second Decl., Ex. L.  The GOB argued that because it had "the right to

select [Professor] Douglas's replacement and [Professor] Douglas's replacement has the right to

participate in the selection of the Chair," the LCIA deprived the GOB of its role in nominating a

replacement chair.  *See id.*, Ex. L at 4.

On April 17, 2012, a three-member Division of the LCIA Court was appointed to decide

the GOB's request for reconsideration of the LCIA Court's decision not to reconstitute the

tribunal, along with the GOB's challenges to Professor Douglas and Mr. Fortier.[19]  The Division

---

[18] The 30 questions that the GOB requested Mr. Douglas answer are set forth in paragraph 18 of the LCIA Division's Decision on Challenges.  *See* Kimmelman Decl., Ex. E ¶ 18.

[19] The three members of the Division included Chair Gerald Aksen, an independent arbitrator and former partner at Thelen Reid & Priest LLP in the United States; Kaj Hober, Professor of International Investment and Trade Law at Uppsala University and partner at Mannheimer Swartling in Stockholm, Sweden; and Douglas Jones, international commercial arbitrator, partner at the law firm of Clayton Utz in Sydney, Australia, adjunct professor at Murdoch University, and professorial fellow at the University of Melbourne Law School.

granted the GOB's request to file a reply to the Bank's April 10 opposition papers, and the GOB

filed its reply on May 17, 2012.  Kimmelman Decl., Ex. E ¶ 31.

### 4.    The LCIA Division's Decision on Challenges

In its Decision on Challenges dated June 1, 2012, the LCIA Division affirmed the LCIA

Court's decision not to reconstitute the entire tribunal and rejected the GOB's challenges to

Professor Douglas and Mr. Fortier.  *See* Kimmelman Decl., Ex. E.

### a.    The Division Properly Denied the GOB's Request to Reconstitute the Tribunal

The Division found that the arbitral tribunal was properly constituted under the LCIA

Rules and that the LCIA properly exercised its authority under Article 11.1 of those Rules.  It

rejected the GOB's argument that after Mr. Landau resigned as chair, the LCIA should have

allowed each party to re-nominate an arbitrator who together would then select the new chair.

As the Division explained, the GOB's position was "not tenable" because Mr. Landau's

resignation "necessitated the replacement of the Tribunal Chair only," and not the party-

nominated arbitrators.  Kimmelman Decl., Ex. E ¶ 60.  "Thus, when the LCIA exercised its

discretion to invite the wing arbitrators . . . to select Mr. Landau QC's replacement, it simply

followed the 'original nominating process' for selecting the Chair, in accordance with both the

arbitration agreement and Article 11.1 of the Rules."  *Id.*  The Division explained that the GOB's

reading of the term "original nominating process" in Rule 11.1 contradicts the intent of that

provision:  "Article 11.1, in providing for the circumstances where 'an appointed arbitrator is to

be replaced,' does not, thereby, authorize the LCIA to replace all three arbitrators.  Indeed, the

result of the Government's proposed construction would be to increase the potential of the

disruption of orderly proceedings."  *Id.*, Ex. E ¶ 61.

The Division also affirmed the LCIA Court's conclusion that the GOB waived its right to appoint an arbitrator, and that Mr. Landau's resignation did not allow the GOB to resurrect that right.  As the Division explained:

> While the parties' arbitration agreement expressly gave the Government a right to nominate an Arbitrator, it also expressly incorporated the LCIA Rules, which provides a procedure for the LCIA's appointment of an arbitrator when a party fails to timely exercise its right.  That is, precisely, what happened here.

*Id.*, Ex. E ¶ 64.  The Division thus found that Professor Douglas's appointment "occurred in full compliance with both the parties' agreement and [LCIA Rule] 5.5.  The need to replace Mr. Landau, therefore, affords no new right on the [GOB]'s part to replace Professor Douglas."  *Id.*

### b. The Division Rejected the GOB's Challenge to Professor Douglas and Found *Hrvatska* did Not Apply to the Parties' Arbitration

The Division considered and rejected the GOB's challenge to Professor Douglas under Articles 5.3 and 10.3 of the LCIA Rules.  It first found that Article 5.3 did not obligate Professor Douglas to answer the GOB's 30 questions regarding the activities of other barristers in his chambers or the operations of his chambers.  *Id.*, Ex. E ¶¶ 44-49.  Nor was Professor Douglas required under Article 5.3 to answer questions "concerning his own practice that do not relate to past or present dealings with the parties and counsel to this proceeding or to Lord Ashcroft."  *Id.* As the Division explained, "[t]he crux of the [GOB's] challenge is that—*contrary to established English legal practice*—Matrix Chambers is not to be regarded as a group of barristers acting as independent practitioners," and that the LCIA should evaluate the activities of other barristers in Matrix Chambers for conflict purposes.  *Id.*, Ex. E ¶ 45 (emphasis added).   To support its argument, the GOB relied, as it does here, "almost exclusively on" the ICSID case of *Hrvatska*

31

*Elektroprivreda, d.d. v. Republic of Slovenia*, ICSID Case no. ARB/05/24 (May 6, 2008).[20] *See id.*  However, *Hrvatska* is inapplicable to this case.

In *Hrvatska*, a bilateral investment treaty dispute under the ICSID Arbitration Rules, the respondent engaged a barrister to appear for the first time in the case at a hearing before an arbitral tribunal whose president was also a member of the same chambers as the barrister.  The claimant, a United States party, sought an order from the tribunal to exclude respondent's counsel from the case.  The party argued:  "For the Claimant who, like many throughout the world, is entirely unfamiliar with the English legal system, the fact that the President of the Tribunal, who will preside over an important hearing . . . and counsel for the Respondent are members of the same 'Chambers,' *is* a matter of great concern . . . ."  *Hrvatska* ¶ 7.

The tribunal observed that "[b]arristers are *sole practitioners*.  Their Chambers are not law firms.  Over the years it has often been accepted that members of the same Chambers, acting as counsel, appear before other fellow members acting as arbitrators."  *Id.* ¶ 17 (emphasis added).

The *Hrvatska* tribunal concluded that, under the ICSID Convention and ICSID Rules, because of the *immediate* risk of bias caused by the barrister's participation in the *same* arbitration as the president of the tribunal, the barrister should be prohibited from participating in the proceedings in order to avoid "the substantial risk of a justifiable apprehension" of the tribunal president's partiality.  *Id.* ¶ 32.  However, the tribunal's ruling was limited to the unique facts of that case and was not intended to disturb long-held assumptions regarding the independence of barristers:

> The Tribunal *does not believe there is a hard-and-fast rule* to the effect that barristers from the same Chambers are *always* precluded from being involved as,

---

[20] A copy of the *Hrvatska* decision is attached as Exhibit R to the Second Kimmelman Declaration.

respectively, counsel and arbitrator in the same case.  Equally, however, there is no absolute rule to opposite effect.  *The justifiability of an apprehension of partiality depends on all relevant circumstances.*

*Id.* ¶ 31 (emphasis added).

The LCIA Division properly recognized that *Hrvatska* has no bearing on this case and

that it

does not endorse the Government's novel, if not unprecedented, proposition that a barrister can be disqualified from acting as an arbitrator solely because of the activities of other barristers in the same chambers, regardless of the relationship of those activities to the arbitration proceeding.  *To the contrary,* Hrvatska *explicitly affirms that chambers are not law firms and that barristers are independent practitioners.*  Hrvatska *does not establish, nor did it seek to propound, a "collaborative venture" test by which chambers would be deemed to be law firms for conflict purposes.*  If that had been the case, the same chambers relationship between President and counsel there would have resulted in *automatic* disqualification (because they came from a chambers that marketed itself with a collaborative connotation), not in a fact-based determination.

Kimmelman Decl., Ex. E ¶ 47 (emphasis added).  The Division further explained that *Hrvatska*

does not mandate a factual inquiry in all cases or obligate an arbitrator to disclose information

about other barristers in his chambers.  Rather, "*Hrvatska* holds that the acknowledged

independence of barristers in chambers ought not to be used as a shield to preclude a fact-based

inquiry as to whether a justifiable doubt may be raised by barristers from the same chambers

acting as arbitrator and party counsel *in the same proceeding.*"[21]  *Id.* Ex. E ¶ 48 (emphasis

added).  The GOB made "no suggestion, however, that any barrister from Matrix Chambers,

other than Professor Douglas, *has acted in the present proceeding.*"  *Id.* (emphasis added).

Accordingly, the Division properly distinguished *Hrvatska* and found "no basis to impose upon

---

[21]  The Division's interpretation of *Hrvatska* is consistent with that of another ICSID tribunal, which declined to find the "hard-and-fast" rule the GOB advocates.  *See Rompetrol Group NV v. Romania*, ICSID Case No. ARB/06/3 (Jan. 14, 2010) ¶ 25, Kimmelman Second Decl., Ex. S (stating that "the *Hrvatska* decision might better be seen as an ad hoc sanction for the failure to make proper disclosure in good time [rather] than as a holding of more general scope").  Thus, even in the investment treaty context, *Hrvatska* may well be confined to its facts.

[Professor Douglas] an obligation to disclose the activities of other barristers in his chambers" under Article 5.3 of the LCIA Rules. *Id.*

The Division likewise considered and rejected GOB's argument that the LCIA Court was required to disqualify Professor Douglas under Article 10.3 of the LCIA Rules, and that *Hrvatska* required "a thorough fact inquiry into the nature of Matrix Chambers."  GOB Response at 31.  The GOB based its challenge, as it does here, on Professor Douglas's "perceived appearance of partiality and lack of independence as a result of the conflicts of his fellow barristers at Matrix Chambers."  Kimmelman Decl., Ex. E ¶ 53.  In rejecting this argument, the Division explained:  "The alleged conflicts, as previously noted, have *nothing to do with this arbitration* and the Government has, indeed, affirmed the Partial Award in which Professor Douglas participated."  *Id.* (emphasis added).

The Division then listed the relevant circumstances of this case that bear upon Mr. Douglas's independence, none of which supported disqualification of Mr. Douglas under Article 10.3 of the LCIA Rules.  It found (1) "no suggestion in the record that Professor Douglas has acted for or against either party to this proceeding"; (2) no evidence that Professor Douglas "acted on any matters related to Lord Ashcroft or any entity in which he is interested" or affiliated; (3) "no suggestion that any other barrister in Matrix Chambers is acting for or against either party in this arbitration" (unlike the situation in *Hrvatska*); and (4) "[t]he London chambers system of barristers acting as independent practitioners is familiar to the [GOB] (unlike the party in *Hrvatska* to whom it was 'fully foreign')."[22]  Kimmelman Decl., Ex. E ¶ 55. The Division concluded that "under the totality of the relevant circumstances in this case," any engagements of other barristers in Matrix Chambers on behalf of Lord Ashcroft or the GOB's

---

[22] In fact, Belize is a former British colony and its legal system is based on the English legal system.  Courtenay Decl. ¶ 5.

other adversaries "do[] not raise the appearance of bias nor a justifiable doubt as to Professor

Douglas's impartiality or independence." *Id.*, Ex. E ¶ 56.  Accordingly, the Division rejected the

GOB's challenge to Professor Douglas.

**c.      The Division Rejected the GOB's Challenge to Mr. Fortier as Tribunal Chair**

Lastly, the Division considered the GOB's argument that the appointment of Mr. Fortier

as tribunal chair was "premature" because the LCIA had not yet resolved the GOB's request to

replace Professor Douglas.  Because the Division had already found that the tribunal was

properly constituted under the LCIA Rules, this argument was rejected as moot.  As the Division

explained, "in view of the Division's decisions . . . to deny the [GOB]'s challenge [to Professor

Douglas] and its request to reconstitute the Tribunal, the [GOB]'s objection is, essentially, moot

because [the GOB] has no right to replace Professor Douglas." *Id.*, Ex. E ¶ 66.

**5.      The LCIA Division's Rulings are Entitled to Deference in this Confirmation Proceeding**

The record demonstrates that the arbitration complied with the procedures the parties

specified in their agreement, and that the LCIA rendered a reasoned decision in which it

addressed all of the GOB's procedural challenges.  Nevertheless, the GOB seeks to reargue these

same points that it argued to the LCIA Court in this enforcement proceeding.  Such tactics are

prohibited under both the Convention and § 207 of the Federal Arbitration Act.  *See*

*Encyclopaedia Universalis S.A.*, 403 F.3d at 90 ("Given the strong public policy in favor of

international arbitration, review of arbitral awards under the Convention is very limited . . . in

order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and

avoiding long and expensive litigation.") (internal quotation and citation omitted);  *AO*

*Techsnabexport*, 656 F. Supp. 2d at 555-56 (rejecting defendant's attempt to "inundate[] the

Court with documents and exhibit[s] in an attempt to have the Court conduct a somewhat *de*

35

*novo* review of the arbitration process that was held" and stating that "judicial review of an arbitration award in federal court is 'substantially circumscribed.' *The confirmation process does not give the opposing party another bite at the apple to re-litigate all the issues that were properly presented to and decided by the arbitral tribunal*" (quoting *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007)) (emphasis added).

The GOB's "belated arguments that [Professor Douglas] was improperly selected are a futile attempt to avoid consequences of its strategic decisions . . . to decline to participate in the selection of an arbitrator." *Karaha Bodas*, 190 F. Supp. 2d at 948-49 (rejecting Article V(1)(d) argument where "[t]he parties intended that in the event a party failed to name an arbitrator within thirty days of the request for arbitration, the [arbitral institution] would do so"). Indeed, the GOB could have petitioned the English courts to remove Professor Douglas pursuant to § 24(1)(a) of the English Arbitration Act if there were a genuine reason to do so. The GOB chose not to do so and now seeks to delay enforcement by re-arguing the same procedural issues that were already decided in the arbitration. This tactic should be rejected.

### B.    Recognition of the Final Award Would Not Violate U.S. Public Policy

The GOB argues that this Court "must decline to enforce the arbitration award because arbitral impartiality is a public policy under Article V(2)(b)." GOB Response at 32. "The public policy defense [under Article V(2)(b)] is to be 'construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice.'" *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 306 (5th Cir. 2004) (quoting *M & C Corp. v. Erwin Behr GmbH & Co., KG*, 87 F.3d 844, 851 n.2 (6th Cir. 1996)). This narrow reading is consistent with "[t]he general pro-enforcement bias informing the [C]onvention." *Id.* (citation omitted).

36

For an arbitral award to be unenforceable under Article V(2)(b), the award must violate an "explicit public policy" that is "well-defined and dominant."  *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1445 (11th Cir. 1998) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983)).  Public policy "is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 697 (D.C. Cir. 2013) (quoting *W.R. Grace & Co.*, 461 U.S. at 766).

The GOB argues that arbitral impartiality is a public policy of the United States based on the Supreme Court's plurality decision in *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145 (1968).  GOB Response at 33.  However, *Commonwealth Coatings* does not establish U.S. public policy.  The plurality decision has been subject to conflicting interpretations by the federal courts as they have struggled to interpret the "majority" decision.  *See, e.g.*, *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 281 (5th Cir. 2007) (en banc) ("Reasonable minds can agree that *Commonwealth Coatings*, like many plurality-plus opinions, is not pellucid."); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (stating that "the fractured court in *Commonwealth Coatings* and our precedent provided us with little guidance concerning what standard is to be applied in construing the 'evident partiality' language of [9 U.S.C. § 10(a)(2)]") (internal quotation and citation omitted).[23]

---

[23]  The GOB cites the district court decision in *In re Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G.*, 480 F. Supp. 352 (S.D.N.Y. 1979), to argue that *Commonwealth Coatings* "*requires* denying enforcement of an arbitral award according to the public policy exception in Article V(2)(b) of the Convention."  GOB Response at 33.  No other court—let alone any court in this Circuit—has used *Commonwealth Coatings* to deny enforcement of

Not surprisingly, the GOB does not cite a single case denying confirmation of an arbitral award under Article V(2)(b) of the Convention based on a violation of U.S. public policy. Although public policy "is often invoked . . . , it rarely results in vacatur or a denial of confirmation, recognition, or enforcement."  *See* Restatement 2d of U.S. Law on International Commercial Arbitration ch. 4 at 4 (Tentative Draft 2, 2012).  This is because the public policy ground under Article V(2)(b) "is exceedingly narrow."  *Id.* at 2.  The GOB's public policy argument should be rejected.

### C.    The GOB's Argument that the Arbitration Did Not Meet the Minimum Requirements of Due Process is Baseless

The GOB argues that "the arbitration proceeding did not meet minimum requirements of due process because the arbitration panel did not provide the required element of impartiality." GOB Response at 39.  This is incorrect.

Article V(1)(b) of the Convention provides a defense to recognition and enforcement of an arbitral award where "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case."  N.Y. Convention Art. V(1)(b).  The provision "sanctions the application of the forum state's standards of due process."  *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Paier (Rakta)*, 508 F.2d 969, 975 (2d Cir. 1974). Under U.S. law, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) (quoting *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)) (denying

---

an award under Article V(2)(b) of the Convention.  Indeed, at least one court has rejected similar efforts to shoehorn allegations of arbitrator bias into the public policy exception of Article V(2)(b).  *See Nicor Int'l Corp. v. El Paso Corp.*, 292 F. Supp. 2d 1357, 1374 (S.D. Fla. 2003) (finding that plaintiffs' public policy argument regarding arbitrator bias "directly or indirectly relate[d] to the arbitral procedure" and was therefore an issue appropriately raised under Article V(1)(d), and not a matter of public policy under V(2)(b)).

enforcement under Article V(1)(d) where tribunal rejected respondent's claim for lack of proof after implying that respondent had used a proper method to substantiate its claim, and stating that "by so misleading [respondent], . . . the Tribunal denied [respondent] the opportunity to present its claim in a meaningful manner").

Thus, courts have rejected challenges to enforcement under V(1)(d) where, notwithstanding any alleged procedural violations, a party had a full opportunity to present its case to the tribunal.  *See Parsons & Whittemore Overseas Co., Inc.*, 508 F.2d at 975 (holding that tribunal's refusal to delay proceedings to accommodate witness's scheduling change was "hardly the type of obstacle . . . which would require the arbitral tribunal to postpone the hearing as a matter of fundamental fairness"); *Hammermills, Inc.*, 1992 WL 122712, at *3-4 (no due process violation where record showed party received sufficient notice that assessment of legal fees was an issue in the parties' arbitration); *Biotronik Mess-und Therapiegeraete GmbH & Co. v. Medford Med. Instrument Co.*, 415 F. Supp. 133, 140 (D.N.J. 1976) (rejecting respondent's Article V(1)(b) argument that it was "unable to present its case" where respondent "received notice of the proceedings" and "offer[ed] no explanation of its failure to participate").

Here, the LCIA found that the arbitral tribunal was constituted in accordance with the rules the parties agreed would govern their arbitration.  There is no suggestion that the GOB was not afforded a full opportunity to be heard.  Indeed, the record shows that the GOB contested the merits of its procedural challenges vigorously.  After it received an unfavorable decision from the Division, the GOB walked out of the proceedings and refused to participate further. Kimmelman Decl., Ex. A ¶¶ 24, 29.  The GOB cannot now argue that it was denied an opportunity to be heard under Article V(1)(b).

### D.      The GOB Has Failed to Establish An Article V(1)(a) Defense

The GOB argues that the alleged invalidity of the 2004 Guarantee, Settlement Deed and

Loan Note is a Convention defense to enforcement of the Award.  GOB Response at 40-41.  It is

not.

Article V(1)(a) of the Convention provides a defense to enforcement if there is a

challenge to the validity of the agreement to arbitrate, *not* to the contract containing the

arbitration agreement.  Article V(1)(a) ("the said agreement [referred to in article II] is not valid .

. . ."); Article II (defining agreement to arbitrate as including "an arbitral clause in a contract or

an arbitration agreement").[24]  Challenges to the contract as a whole, as have been made in this

case, do not constitute an Article V(1)(a) defense.  *See Telenor Mobile Commc'ns AS v. Storm*

*LLC*, 524 F. Supp. 2d 332, 355, 368 (S.D.N.Y. 2007) (rejecting Article V(1)(a) defense where a

foreign court's decision "could be, at most, evidence of the Shareholders Agreement's invalidity,

and not of the invalidity of the separate arbitration clause"), *aff'd on other grounds*, 584 F.3d

396, 410 (2d Cir. 2009); *see also* Restatement of the Law (Third) of International Commercial

Arbitration § 4-12 cmt. e. (Council Draft No. 3, 2011) (under Article V(1)(a), "courts do not

review the arbitral tribunal's rulings on challenges to the validity of the contract as a whole, such

as a claim that a contract including an arbitration clause was fraudulently induced or is illegal").

The GOB relies on *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*,

334 F.3d 274 (3d Cir. 2003), for the proposition that the district court was required to consider

the validity of the parties' entire agreement.  GOB Response at 40.  *China Minmetals* does not

support the GOB's argument.  First, the appellant in *China Minmetals* specifically challenged the

existence or validity of the agreement to arbitrate.  By contrast, the GOB has challenged the

---

[24] *See* van den Berg, *The New York Convention of 1958* at 156 (a lack-of-consent defense under Article II(3) of the Convention "must concern the arbitral clause specifically" as "the lack of consent for the main contract does not necessarily constitute lack of consent for the arbitral clause contained in it").

legality of the Settlement Deed as a whole, *not* the agreement to arbitrate specifically.  Second, the appellant in *China Minmetals* had made a timely objection to the validity of the arbitration agreement before the arbitral tribunal.  Here, the GOB selectively participated in the arbitration and sought the benefit of the First Partial Award, but did not raise any objection to the validity of the agreement to arbitrate.  Kimmelman Second Decl. ¶ 7.

The GOB attacks the parties' contracts as a whole, rather than the arbitration agreement specifically.  Furthermore, as previously discussed, the GOB fully and finally litigated the validity and enforceability of the arbitration agreement upon which the Final Award is based as well as the contract containing the arbitration agreement.  *See supra* at 2-5.  There is no basis for the GOB to assert an Article V(1)(d) defense in this proceeding.

## VI.   THE COURT SHOULD DECIDE ALL THE ISSUES RELATING TO THE PETITION TO CONFIRM TOGETHER

The GOB argues that the issue of foreign sovereign immunity must be "fully adjudicated" first and that the "GOB has a right to an interlocutory appeal, prior to a decision on the merits."  GOB Motion at 33.  This is incorrect and would only lead to unnecessary delay.

It is settled law that enforcement of an arbitration award is a summary proceeding.  To support the strong federal policy in favor of arbitral dispute resolution, Congress has directed the district courts to grant "streamlined treatment" to an application for enforcement of an arbitral award. *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).  Consequently, award enforcement proceedings "take the form of a summary procedure." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007) (internal quotation and citation omitted) (emphasis added).

As a result, courts hearing arbitration award enforcement cases routinely resolve multiple issues, such as jurisdictional issues and Convention defenses, all at once in a single expedited

proceeding. *See, e.g., Belize Social Dev. Ltd. v. Gov't of Belize,* 5 F. Supp. 3d  25 (D.D.C. 2013)

(deciding all of respondent's jurisdictional and Convention defenses at the same time); *Int'l*

*Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech*., 763 F. Supp. 2d 12 (D.D.C. 2011)

(simultaneously deciding respondents' Convention and non-Convention arguments against

enforcement); *Hammermills Inc*., 1992 WL 122712 (D.D.C. May 29, 1992) (simultaneously

addressing respondent's arguments that it was denied due process and that it was not a "real

party in interest").  In *TMR Energy*, the D.C. Circuit affirmed enforcement of a foreign arbitral

award after all issues were considered in a single proceeding. 411 F.3d at 305.  This case should

not be treated any differently.

The GOB argues that it should be permitted to take an interlocutory appeal on the issue of

immunity before the Court proceeds to the merits.  GOB Motion at 33-34. That argument makes

no sense in the context of an award enforcement proceeding.  There are no "merits" to be

decided; the merits of the case have already been decided by an arbitral tribunal.  The federal

policy in favor of expeditious enforcement of a Convention award must prevail over the GOB's

attempt to delay enforcement of the Final Award.

## VII.   DISCOVERY IS INAPPROPRIATE

The GOB argues that it "should be provided the opportunity to conduct limited discovery

with respect to the partiality of Arbitrator Douglas."  GOB Response at 41.  There is no

legitimate basis for discovery in this summary proceeding.

Courts have allowed discovery in an award confirmation proceeding only in rare

instances where the party seeking discovery has made a convincing showing that the discovery is

relevant to one of the specific defenses cognizable under the applicable arbitration law.  *See*

*Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 337 (5th Cir. 1976) (rejecting

respondent's request for discovery in Convention enforcement proceeding as an

attempt by "[t]he loser in [an] arbitration" to "freeze the confirmation proceedings in their tracks and indefinitely postpone judgment by merely requesting discovery"); *see also Schwartz v. Merrill Lynch & Co., Inc.*, No. 09 Civ. 900 (WHP), 2009 WL 2496028, at *1-2 (S.D.N.Y. Aug. 5, 2009) (holding that post-arbitration discovery is confined to "very limited circumstances" and denying discovery); *Empresa Constructora Contex Limitada v. Iseki, Inc.*, 106 F. Supp. 2d 1020, 1024-25 (S.D. Cal. 2000) (in confirmation of foreign arbitration award, the availability of post-arbitration discovery is "strictly limited," and requires the party requesting discovery to show "clear evidence" of a cognizable defense to enforcement).

Discovery aimed at an arbitrator is "limited to situations where clear evidence of impropriety has been presented." *In re Andros Compania Maritima, S.A. & Marc Rich & Co., A.G.*, 579 F.2d 691, 702 (2d Cir. 1978) (holding that district court was justified in denying discovery aimed at arbitrator, where papers presented to court failed to establish any evidence of partiality beyond professional relationship between arbitrator and party). The GOB has failed to establish any circumstances justifying discovery here.

## VIII.   PREJUDGMENT INTEREST SHOULD BE AWARDED

In addition to confirmation of the Final Award, Petitioner seeks an award of prejudgment interest. Courts have discretion to award prejudgment interest when doing so is "consistent with the underlying arbitration award." *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 164 (D.D.C. 2013) (quoting *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1103 (9th Cir. 2011)); *see also Hammermills Inc.*, 1992 WL 122712, at *8 ("Courts have consistently allowed prejudgment interest in actions brought to confirm arbitration awards.") (citing *Reefer Express Lines Pty., Ltd. v. Gen. Auth. for Supply Commodities*, 714 F. Supp. 699, 699 (S.D.N.Y. 1989); *Century Int'l Arms, Ltd. v. Fed. State Unitary Enter.*, 172 F. Supp. 2d 79, 97-98 (D.D.C. 2001) (confirming

arbitration award and awarding prejudgment interest at 15% per annum, as awarded by the arbitral tribunal); *In re Waterside Ocean Navigation Co., Inc., & Int'l Navigation Ltd.*, 737 F.2d 150, 153-55 (2d Cir. 1984) (holding that prejudgment interest is available in actions brought to enforce arbitral awards under the Convention).

Here, the Tribunal awarded interest as part of the Final Award and provided that interest should accrue from September 8, 2012 until the date of payment at the contractual rate of 17% compounded on a monthly basis.  Kimmelman Decl., Ex. A ¶ 144(e).  The Court should award interest from the date specified in the Final Award until the entry of judgment at the same rate awarded by the Tribunal in the Final Award based on the terms of the Settlement Deed.  That rate reflects the parties' commercial agreement as to the harm that would be suffered if amounts due and owing under the Settlement Deed were not paid.  The Court should honor the parties' commercial agreement and award prejudgment interest on that basis.

## IX.    THE JUDGMENT SHOULD BE MADE IN U.S. DOLLARS

U.S. courts must render money judgments payable in U.S. dollars, regardless of the currency of the obligation from which the judgment originated.  *See  Cont'l Transfer Technique*, 932 F. Supp. 2d at 158 ("Conversion of [arbitral awards in foreign currency] into dollars at judgment is the norm, rather than the exception."); *McKesson Corp. v. Islamic Republic of Iran*, 116 F. Supp. 2d 13, 27-43 (D.D.C. 2000) (granting shareholders' motion for summary judgment on the issue of liability and awarding damages of $20 million based on obligations owed in Iranian currency), *aff'd in part, rev'd in part on other grounds*, 271 F.3d 1101 (D.C. Cir. 2001); *Bamberger v. Clark*, 390 F.2d 485 (D.C. Cir. 1968) (converting foreign obligation to U.S. dollars for judgment, with conversion effective as of the date of breach).

Accordingly, the monetary relief in the Final Award, stated partially in Belize Dollars and partially in U.K. Pounds Sterling, should be confirmed and converted into U.S. Dollars as of January 15, 2013, the date of the Final Award, and judgment should be entered in U.S. Dollars.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court enter an order (1) recognizing and confirming the Final Award and directing that judgment be entered in favor of Petitioner and against Respondent in accordance with the Final Award in U.S. Dollars; (2) awarding prejudgment interest at the rate determined by the Arbitral Tribunal pursuant to the Loan Note; and (3) granting such other and further relief as may be just and appropriate.  A proposed order is attached.

Dated: October 17, 2014

SIDLEY AUSTIN LLP

By: /s/ Louis B. Kimmelman
      Louis B. Kimmelman
      DC Bar Number:  NY0179

Dana C. MacGrath
DC Bar Number:  NY0180
787 Seventh Avenue
New York, New York 10019
bkimmelman@sidley.com
dmacgrath@sidley.com
Telephone: (212) 839-5200
Facsimile:  (212) 839-5599

Kristin Graham Koehler
DC Bar Number: 464422
1501 K Street NW
Washington, DC 20005
kkoehler@sidley.com
Telephone: (202) 736-8359
Facsimile: (202) 736-8711

*Counsel for Petitioner*
The Belize Bank Limited