# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BCB HOLDINGS LIMITED and
THE BELIZE BANK LIMITED,

     Petitioners/Plaintiffs

     v.

THE GOVERNMENT OF BELIZE,

     Respondent/Defendant.

Civil Action No. 14-1123 (CKK)

## MEMORANDUM OPINION
(June 24, 2015)

This matter comes before the Court on review of an arbitration award pursuant to 9

U.S.C. § 207 and the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards ("New York Convention" or "Convention").  Petitioners BCB Holdings Limited and the

Belize Bank Limited ("BBL") (collectively "petitioners") initiated an arbitration on October 16,

2008, before the London Court of International Arbitration ("LCIA") in London, England.  The

Government of Belize ("GOB") opted to abstain from the arbitration, and the proceedings were

conducted *ex parte*.  On August 18, 2009, the arbitral tribunal issued an award in favor of

petitioners and concluded that the GOB owed petitioners BZ$40,843,272.34 in damages plus

interest and costs ("Award").[1]  On July 1, 2014, BCB and BBL filed a Petition to Confirm

Foreign Arbitration Award and to Enter Judgment or, Alternatively, Complaint to Recognize and

---

[1] In their petition, petitioners note that the Award was issued on August 20, 2009.  *See* Pet. ¶ 27.
However, in a later filing, petitioners state that the Award was issued on August 18, 2009.  *See*
Opp. to Resp. to Pet. at 42.  The first page of the Award lists both dates, but the Court interprets
this document to indicate that the issuance date is August 18, 2009, and the later date is the
certification date by the LCIA Registrar.

Enforce Foreign Money Judgment.  *See* Petition to Enforce (July 01, 2014), Docket No. [1] ("Pet.").  On January 30, 2015, the GOB filed a motion to dismiss the petition and complaint[2] (*see* Motion to Dismiss (Jan. 30, 2015), Docket No. [26] "Mot.") and a response to the petition (*see* Response to Petition (Jan. 30, 2015), Docket No. [28] "Resp. to Pet.").  For the reasons explained below, the Court shall GRANT the petition and DENY respondent's motion to dismiss.

## I.  BACKGROUND

BCB Holdings, previously known as Carlisle Holdings Limited, entered into a Settlement Deed with the GOB on March 22, 2005.  *See* Pet. ¶ 4.  The Settlement Deed was subsequently amended on June 21, 2006.  *See id*.  The Settlement Deed contains an arbitration clause which memorialized the parties' intention to arbitrate all disputes pursuant to the arbitration rules of the LCIA.  *See id.* ¶ 20.  In 2008, a dispute arose between the parties related to Clauses 4.1 and 4.2 of the Settlement Deed, in which the GOB agreed to provide favorable tax treatment[3] to BBL and BCB Holdings.[4]  *See id.* ¶ 21.  Specifically, in August 2008, the Belize Commissioner of Income Tax rejected tax returns that were filed by BBL in accordance with the Settlement Deed. *See id*. ¶ 22.  Petitioners considered this rejection a repudiation of the Settlement Deed and

---

[2] On April 29, 2015, petitioners filed a Motion for leave to file a sur-reply (Docket No. [38]) to respondent's motion to dismiss which the Court GRANTS.

[3] Specifically, in Clauses 4.1 and 4.2 of the Settlement Deed, the GOB warranted that BBL could offset overpayment of business taxes against future business tax payments and that petitioners would be indemnified against all costs, expenses, losses and damages incurred by them arising out of any breach of warranties provided by the Settlement Deed.  *See* Pet. ¶ 21.

[4] BCB Holdings and BBL are both Belize registered companies.  BCB Holdings is the parent company of BBL.  *See* Pet. ¶¶ 7-8.

sought to engage the GOB in arbitration before the LCIA on October 16, 2008.  *See id.* ¶ 23.
The GOB did not participate in the arbitral proceedings.  *See id.* ¶ 24.

The arbitral tribunal, consisting of three arbitrators, unanimously rendered a foreign
arbitral award in favor of petitioners on August 18, 2009.  *See id.* ¶ 27.  The arbitral tribunal
concluded that the GOB had promised to provide certain tax treatment to petitioners and that
"[i]n refusing to accept [petitioners'] tax returns based on this treatment, Respondent [GOB]
breached its contractual warranty and clearly evinced its intention not to honour the agreement."
Award ¶ 97[5]; Pet. ¶ 27.  The arbitral tribunal also awarded petitioners BZ$40,843,272.34 in
damages plus interest and costs to be paid by the GOB for breach of contract.  *See* Pet. ¶ 27.

On August 21, 2009, petitioners sought to enforce the arbitral award in Belize.  *See id.* ¶
55.  Opposing the enforcement of the Award, the GOB argued that the Award was contrary to
the law and public policy of Belize.  *See id.*  The Supreme Court of Belize enforced the Award in
late 2010, and the GOB appealed this decision in early 2011 to the Belize Court of Appeals.  *See
id.* ¶¶ 56-57.  The appellate court reversed the decision below and held that the Award would not
be enforced.  *See id.* ¶ 58.  On July 26, 2013, the Caribbean Court of Justice ("CCJ"), Belize's
final court of appeal, affirmed on public policy grounds, holding that the implementation of the
tax treatment provisions of the Settlement Deed were not legislatively approved, which was
"repugnant to the established legal order of Belize."  *Id.* ¶ 59 (quoting *BCB Holdings Ltd., et al.,
v. Attorney General of Belize*, CCJ Appeal No. CV 7 of 2012, ¶ 53).

Petitioners also sought enforcement of the Award in England.  The High Court of Justice,
Queen's Bench Division, Commercial Court, in the United Kingdom, granted petitioners leave to

---

[5] The Award and the Settlement Deed are available in exhibit 2 to the petition.  *See* Pet. Ex. 2,
First Kimmelman Decl.

enforce the Award as a judgment and issued a foreign money judgment on February 26, 2013

("U.K. Judgment").  *See* Pet. ¶ 84-87.  The U.K. Judgment recognized and confirmed the arbitral

award and provided pre- and post-judgment interest at an annual rate of 3.38%, compounded

annually, and past and future costs of the arbitration.  *See id.* ¶ 87.

On March 31, 2010, the GOB enacted a criminal statute that penalized parties that

violated Belize Supreme Court injunctions and those that aided such violations.  *See id.* ¶ 41.

Penalties included mandatory fines between $50,000 and $250,000 and/or imprisonment for a

minimum of five years.  *See id.* ¶¶ 42-43.  This statute applied to offenses committed both in

Belize and in other jurisdictions.  *See id.* ¶ 43.  In the meantime, the GOB initiated litigation to

enjoin several enforcement proceedings in any forum other than Belize courts.  *See id.* ¶ 29.

According to Petitioners, "the ease with which the GOB obtained injunctive relief in the Belize

courts, coupled with the new mandatory penalties for violating such injunctions, had a chilling

effect upon companies in Belize asserting legal claims against the GOB outside of Belize."  *Id.*

BCB Holdings, BBL, and other companies challenged this criminal statute in legal

proceedings in Belize.  *See id.* ¶ 47.  Although the Belize Supreme Court upheld the law, the

Belize Court of Appeals and the CCJ concluded in 2012 and 2014 respectively, that the sections

of the law that created a criminal offense with mandatory penalties for violating Belize Supreme

Court injunctions were unconstitutional and unenforceable.  *See id.* ¶¶ 49-50.  In its final

decision on the validity of the 2010 criminal statute, the CCJ outlined limited circumstances in

which the Belize Supreme Court could issue injunctions related to arbitration proceedings.  *See*

*id.* ¶ 52.

Between early 2009 and January 2014, while the mandatory penalties on parties who

violated Belize court injunctions were still in effect, the GOB obtained numerous injunctions

against parties with claims against the GOB.  *See id.* ¶ 54.  One such injunction was obtained

against the British Caribbean Bank ("BCB Bank"), a subsidiary of BCB Holdings.  BCB Bank

had filed a treaty arbitration against the GOB in 2010, but the GOB filed a claim in Belize

Supreme Court seeking a declaration that the Belize Supreme Court was the proper forum for

addressing a dispute between the parties.  *See id.* ¶¶ 39-40.  In so doing, the GOB obtained an

anti-arbitration injunction against BCB Bank that restrained BCB Bank from pursuing the

arbitration outside of Belize.  *See id.* ¶ 40.  This injunction was only discharged by the CCJ in

2013.  *See id.* ¶¶ 51-52.  The GOB did not request or obtain a similar injunction against BCB

Holdings or BBL.

Petitioners filed this action on July 1, 2014, to confirm the arbitral Award pursuant to

Section 207 of the Federal Arbitration Act ("FAA"), convert the Award plus costs and interests

to United States dollars, and enter judgment in favor of petitioners.  In the alternative, petitioners

filed a complaint to recognize and enforce a foreign money judgment (U.K. Judgment) pursuant

to the District of Columbia Foreign-Money Judgments Recognition Act of 2011, D.C. Code §

15-361 *et seq*.

The GOB timely filed a motion to dismiss the petition and motion to dismiss or strike the

complaint.  In addition, the GOB also submitted a response to the petition.  In these two filings,

the GOB lodges a series of arguments why this Court should not confirm the arbitral award or

enforce the U.K. judgment.  Namely, the Settlement Deed containing the arbitration clause is

invalid; enforcement would violate the revenue rule; the Award is against U.S. public policy; the

New York Convention does not apply to the dispute between the parties; the Court lacks subject-

matter jurisdiction because Belize is entitled to foreign sovereign immunity; the Court lacks

personal jurisdiction; the petition is time barred; the doctrines of *res judicata*, collateral estoppel,

5

or international comity preclude enforcement of the Award; and there is a more convenient alternative forum. *See* Resp. to Pet. at 1; Mot. at 1. In addition, the GOB urges the Court to dismiss the complaint to recognize the U.K. Judgment because it was improperly joined with this confirmation action, the Court lacks subject matter and personal jurisdiction, *res judicata* and international comity must be applied, the foreign judgment is against public policy, and it conflicts with the final CCJ judgment. *See* Mot. at 2. Petitioners oppose all of these arguments. *See* Pet'r Opp. to Mot. (Mar. 2, 2015), Docket No. [29]; Opp. to Resp. to Pet. (Mar. 2, 2015), Docket No. [30].

## II. LEGAL BACKGROUND

United States federal courts have a robust history of enforcing arbitral awards. Indeed, the Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (noting that there is a "strong federal policy in favor of enforcing arbitration agreements.") In 1970, the United States acceded to the New York Convention. The New York Convention was implemented in the United States by amendment of the FAA. *See* Act of July 31, 1970, Pub.L. 91–368, 84 Stat. 692, codified at 9 U.S.C. §§ 201-208.

This Court has jurisdiction to enforce an arbitral award against a foreign state pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, *et seq* ("FSIA"). *See* 28 U.S.C. § 1330(a) ("The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not

entitled to immunity."). It is undisputed that the GOB is a foreign state under 28 U.S.C. § 1603(a). Under the FSIA,

> [a] foreign state shall not be immune from the jurisdiction of courts of the United States in any case − . . . in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship . . . or to confirm an award made pursuant to such an agreement to arbitrate, if . . . the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a), (a)(6), & (a)(6)(B). "The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception." *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999).

United States courts have little discretion to refuse to confirm an award under the FAA. The FAA provides that in exercising its original jurisdiction over enforcing international arbitral awards, the district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207. *See Yusuf Ahmed Alghanim & Sons, W.I.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997) ("There is now considerable case law holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an arbitral award."). The grounds for refusal enumerated in the Convention are as follows:

> 1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:
>
>    (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

      (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings . . . ; or

      (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration . . . ; or

      (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ; or

      (e) The award has not yet become binding, on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

      (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

      (b) The recognition or enforcement of the award would be contrary to the public policy of that country.

New York Convention, art. V, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (effective for the United States on Dec. 29, 1970).

      In its response to the petition to enforce the award and enter judgment, the GOB argues that the Court should refuse to enforce the award pursuant to Article V(1)(a), 2(a), and (2)(b) of the New York Convention. *See* Resp. to Pet. at 1. In its motion to dismiss, the GOB submitted numerous defenses to enforcing the Award, none of which fall within Article V of the New York Convention because, according to the GOB, the New York Convention does not apply because 1) the dispute between the parties was not commercial, and 2) Belize has not ratified the Convention. *See* Mot. at 16. Although, as discussed above, the Court may only refuse to enforce an award pursuant to Article V of the New York Convention, the Court will first take up the GOB's jurisdictional and other non-Article V arguments. It will then address the merits of the GOB's Article V arguments.

## III. DISCUSSION

### A. *Jurisdiction*

1.  Applicability of the New York Convention

Petitioners rightly argue that the New York Convention governs the enforcement of the Award. *See* Pet'r Opp. to Mot. at 7-10. The New York Convention covers "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." N.Y. Convention, art. I(1). Pursuant to the framework set forth by the New York Convention, "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." *Id*. at art. III.

Under the FAA, arbitration agreements arising out of a legal relationship that are considered commercial fall under the New York Convention. *See* 9 U.S.C. § 202. This affirms the notion that the purpose of the New York Convention is "to 'encourage the recognition and enforcement of commercial arbitration agreements in international contracts.'" *TermioRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974)). The commercial relationship requirement, however, is construed broadly. *See Bautista v. Star Cruises*, 396 F.3d 1289, 1298 (11th Cir. 2005) ("Congress meant for 'commercial' legal relationships to consist of contracts evidencing a commercial transaction . . . *as well as* similar agreements.") The Settlement Deed resolved a previous dispute between the parties that arose from the GOB's purchase of shares of stock in Belize Telecommunications Limited from Carlisle Holdings Limited, the predecessor of BCB Holdings. *See* Opp. to Resp. to Pet. at 9. The Settlement Deed and included arbitration agreement "resolved the dispute between the parties relating to this purchase and sale of stock." *Id*. The underlying transaction was commercial, and the agreement to resolve the dispute arising out of this transaction facilitated the commercial legal relationship between the parties.

Therefore, the Settlement Deed was indeed commercial for purposes of the FAA and the New York Convention.

In *Belize Soc. Dev. Ltd. v. Gov't of Belize*, the D.C. Circuit confronted nearly identical facts as those at hand. Specifically, the former Prime Minister of Belize executed an agreement with Belize Telemedia Limited on behalf of the GOB that included an agreement to submit any unresolvable disputes to arbitration under the LCIA rules. *See* 668 F.3d 724, 728 (D.C. Cir. 2012). In 2008, Belize's newly appointed Prime Minister declared that the contractual agreement and the included agreement to arbitrate were invalid, and the GOB declined to participate in the subsequent arbitration proceedings. *See id.* The arbitral tribunal issued a final award stating that it had jurisdiction over Telemedia's claim, that the agreement was valid, and that Telemedia was entitled to relief. *See id.* Subsequently, Telemedia filed a petition to enforce the award in the District Court for the District of Columbia, and on appeal of an Order to Stay, the D.C. Circuit analyzed the claims within the framework of the New York Convention. *See id.* at 727. "The fact that Belize is not a party to the New York Convention is irrelevant. If the place of the award is 'in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.'" *Id.* at 731 n.3 (quoting *Creighton*, 181 F.3d at 121). Similarly, the arbitral tribunal in the case at bar issued the Award in England and petitioners seek enforcement of it in the United States. Both the United States and England are parties to the New York Convention, and thus, the New York Convention applies.

## 2. Subject-matter jurisdiction

The GOB also argues that this Court does not have subject matter jurisdiction. The GOB argues that the FSIA exception to sovereign immunity for arbitration governed by an

international treaty does not apply, and the former Prime Minister lacked authority to enter into

the initial agreement with BCB Holdings, and consequently, Belize did not agree to arbitrate.

*See* Mot. at 21.  The Court is satisfied that it has subject matter jurisdiction in this matter.

"The FSIA confers upon district courts subject matter jurisdiction as to 'any claim for

relief in personam with respect to which the foreign state is not entitled to immunity.'" *TMR*

*Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 324 (D.C. Cir. 2005) (quoting 28

U.S.C. § 1330(a)); *see also*, *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548

(D.C. Cir. 1987) ("If an exception to the main rule of sovereign immunity applies, then the FSIA

confers subject matter jurisdiction on the district courts.").  The FSIA provides an exception to

foreign sovereign immunity for actions to confirm arbitration awards that are governed by an

international treaty in force in the United States calling for the recognition and enforcement of

arbitral awards.  *See* 28 U.S.C. § 1605(a)(6)(B) (quoted above).  Despite the GOB's arguments to

the contrary, all of these requirements have been met.

The GOB argues that the arbitration exception to foreign sovereign immunity does not

apply because the agreement to arbitrate is void *ab initio* because the former Prime Minister of

Belize lacked actual authority to execute the Settlement Deed, including the arbitration clause.

*See* Mot. at 22-23.  However, the proposition that this Court must conduct a *de novo* review of

the arbitrability of the dispute to find subject-matter jurisdiction "runs counter to the clear

teaching of this Circuit on the purpose and role of the FSIA.  The FSIA is a jurisdictional statute

that 'speak[s] to the power of the court rather than to the rights and obligations of the parties.'"

*Chevron Corp. v. Republic of Ecuador*, 949 F.Supp.2d 57, 63 (D.D.C. 2013) (quoting *Creighton*,

181 F.3d at 124).  Inquiring into the merits of whether this dispute was rightly submitted to

arbitration is beyond the scope of the FSIA's jurisdictional framework.  *See id.* at 63-64

(reviewing case law and concluding that in assessing subject-matter jurisdiction, federal courts have examined only "whether the award was made pursuant to an appropriate arbitration agreement with a foreign state and whether the award 'is or may be' governed by a relevant recognition treaty.")  Regardless, the Court considers the merits of the GOB's argument pursuant to Article V of the Convention in Section III(E)(1) of this opinion.  However, as to the FSIA exception, the Court is satisfied that the FSIA's arbitration exception applies, and the Court has subject-matter jurisdiction to enforce the Award.

### 3.   Personal Jurisdiction

The GOB also argues that this Court does not have personal jurisdiction over Belize because "[t]he minimum contacts requirements of Due Process cannot be satisfied as to GOB." Mot. at 32.  The GOB asserts that "compelling reasons exist to safeguard sovereigns against the unfettered exercise of personal jurisdiction." *Id*.  However, "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense." *GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) (citing *TMR Energy*, 411 F.3d at 300-01; *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96-97 (D.C. Cir. 2002)).  The D.C. Circuit has held that the FSIA requirements suffice, and therefore, "subject matter jurisdiction plus service of process equals personal jurisdiction." *Practical Concepts*, 811 F.2d at 1548 n.11 (quoting *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981)) (internal quotation marks omitted); *see also* FSIA 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.").  The GOB has not contested proper service.

12

B.  *Statute of Limitations*

The FAA provides that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."  9 U.S.C. § 207.  The arbitral panel issued the award on August 18, 2009, and petitioners filed their petition for enforcement of the award on July 1, 2014.  The GOB argues that the petition is time-barred by the FAA, and petitioners' right of action was not equitably tolled by the 2010 criminal statute.  *See* Mot. at 8.  The Court disagrees.

A "petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) (internal quotation marks omitted).  Petitioners have shown that they have been pursuing their rights to the arbitral award diligently since 2009.  On August 21, 2009, petitioners sought enforcement of the award in Belize.  They also brought their claim to the United Kingdom and received a foreign money judgment in 2013.  In April 2010, petitioners joined in litigation challenging the constitutionality of the 2010 criminal statute.  *See* Pet. ¶ 47; *see also* Pet'r Opp. to Mot. at 14.  Also, BCB Bank, a BCB Holdings subsidiary, appealed an injunction issued by the Belize Supreme Court that prevented it from resolving its arbitration claim outside of Belize.  *See* Pet'r Opp. to Mot. at 14.  The 2010 criminal statute was dismantled by the CCJ in January 2014, and petitioners initiated this action six months later in July 2014.  Petitioners have diligently sought the enforcement and confirmation of the Award since it was issued in 2009 through both enforcement actions and litigation of the statute that

13

created a risk of exposure to criminal penalties if petitioners had filed this action within the three-year limitations period.

Petitioners have also shown that they faced extraordinary circumstances that prevented them from timely filing an enforcement action.  The mandatory criminal penalties in effect between 2010 and 2014 subjected petitioners and their attorneys to the risk of imprisonment and a substantial fine if they attempted to enforce the award in this or any other jurisdiction. Although these facts were described in detail in the petition, the GOB did not contest them in its motion.  Instead, the GOB argues that petitioners slept on their rights because the criminal statute did not affect petitioners considering that the Belize Supreme Court had not issued an injunction specifically barring their recovery.  *See* Mot. at 9.  However, petitioners have demonstrated that the 2010 criminal statute had a "chilling effect" on seeking enforcement of the Award.  *See* Pet. ¶ 29.  And once this impediment to enforcement was lifted in 2014, petitioners immediately took advantage of the changed circumstances and filed this action.

Petitioners have satisfied the criteria for equitable tolling, and the period during which they were barred from pursuing their rights while the 2010 criminal statute was in effect is excluded from the limitations period.  Thus, petitioners are not time-barred from seeking enforcement of the arbitral award.

### C.  Effect of CCJ Decision

The GOB argues that the final judgment rendered by the CCJ prevents petitioners from attempting to enforce the Award in this jurisdiction.  Specifically, the doctrines of *res judicata*, collateral estoppel, and international comity bar the Petition because a competent court, the CCJ, issued a final judgment refusing to enforce the Award.  *See* Mot. at 10-15.  These arguments are unavailing.

The New York Convention provides that "1. Recognition and enforcement of the award may be refused . . . if . . . (e) [t]he award . . . has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." N.Y. Convention, art. V(1)(e). The country under which an award was made is considered the primary jurisdiction whilst other member-countries to the New York Convention are designated as secondary jurisdictions. Secondary jurisdictions may refuse to enforce an award, but these decisions do not preclude other jurisdictions from enforcing it. By contrast, only a primary jurisdiction may set aside an award. *See Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) ("Under the Convention, 'the country in which, or under the [arbitration] law of which, [an] award was made' is said to have *primary* jurisdiction over the arbitration award. All other signatory States are *secondary* jurisdictions, in which parties can only contest whether that State should enforce the arbitral award.") Thus, the GOB must show that Belize is a country under the law of which the award was made in order to succeed on its argument that the CCJ decision to refuse enforcement of the award precludes this Court from granting the petition.

The GOB cannot make such a showing. The Settlement Deed provides that any disputes that cannot be resolved by the parties shall be referred to and resolved by "arbitration under the London Court of International Arbitration (LCIA) Rules which Rules are deemed to be incorporated by reference under this clause." Award ¶ 20 (quoting Settlement Deed); *see also* Settlement Deed at 11.2. "The phrase 'under the law of which' in Article V(1)(e) . . . refers to the procedural law governing the arbitration." *Belize Soc. Dev. Ltd.*, 668 F.3d at 731 (citing *Karaha Bodas v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 289 (5th Cir. 2004)). Because the arbitration was conducted in England under English arbitral laws,

England is the country with primary jurisdiction. *See, e.g.*, *Steel Corp. of the Philippines v. Int'l Steel Servs., Inc.*, 354 Fed. Appx. 689, 692 (3d Cir. 2009) (concluding that Singapore is the country with primary jurisdiction because the arbitrator applied Singapore procedural law in reaching the award). As England is the country with primary jurisdiction, only an English court may set aside the arbitral award issued by the LCIA. Consequently, although the CCJ decided not to enforce the award, its decision to do so does not hold preclusive effect on this Court.

   D.  *Forum Non Conveniens*

   The GOB also argues that dismissal is warranted on *forum non conveniens* grounds. *See* Mot. at 36. Under this doctrine, the Court "must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *Agudas Chisidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981)). The GOB cannot satisfy the first step of the *forum non conveniens* test: "only a court of the United States (or of one of them) may attach the commercial property of a foreign nation located in the United States." *TMR Energy*, 411 F.3d at 303. The GOB argues that the D.C. Circuit's holding in *TMR Energy* is no longer good law because of the Supreme Court's holding in *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.* that "[a] federal court has discretion to dismiss a case on the ground of *forum non conveniens* 'when an alternative forum has jurisdiction to hear [the] case.'" 549 U.S. 422, 429 (2007). However, these two cases are not in conflict. In *Sinochem*, the Supreme Court held that courts may dismiss a case on *forum non conveniens* considerations before definitively determining jurisdiction when such an inquiry is burdensome. 549 U.S. at 436. By contrast, in *TMR Energy*, the Court did not address the timing of assessing the appropriateness of the forum, but rather, the D.C. Circuit plainly stated that there

is no alterative forum that has jurisdiction to attach the commercial property of a foreign nation located in the United States. 411 F.3d 296 at 303. Thus, *TMR Energy* controls the specific *forum non conveniens* question before the Court. The GOB cannot show that an alternative forum exists, so the Court need not engage in the balancing step of the *forum non conveniens* test. *TMR Energy*, 411 F.3d at 303 ("The district court need not weigh any factors favoring dismissal . . . if no other forum to which the plaintiff may repair can grant the relief it may obtain in the forum it chose.").

### E. New York Convention

As discussed above, courts "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermioRio*, 487 F.3d at 935 (quoting *Yusuf Ahmed Alghanim*, 126 F.3d at 23) (internal quotation marks omitted). Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading and Indus. Inv. Co. v. DynCorp Aerospace Technology,* 763 F.Supp.2d 12, 20 (D.C. Cir. 2011). "[T]he burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation," and "the showing required to avoid summary confirmation is high." *Id.* (quoting *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976); *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)) (internal quotation marks omitted).

The GOB has brought three defenses under Article V to the New York Convention against the enforcement of the Award. For the reasons stated below, the GOB cannot meet its burden under Article V.

1.   Article V(1)(a) – Validity of the Agreement

The GOB argues enforcement of the Award should be refused pursuant to Article

V(1)(a).  Specifically, the GOB argues that the Settlement Deed was not valid under Belizean

law because the former Prime Minister did not have actual authority to agree to it.  *See* Resp. to

Pet. at 13-15.  As a result, the GOB was not a party to the contract and was not able to agree to

arbitrate any disputes thereto.  *See id.* at 15.  The GOB has not challenged the validity of the

arbitration agreement itself beyond the assertion that the arbitration provision is part of the

allegedly invalid contract.

The GOB relies on *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei

Corp.*, 334 F.3d 274 (3d Cir. 2003) for the proposition that this Court must review the validity of

the contract as a whole.  *See* Resp. to Pet. at 13-14.  In *China Minmetals*, the party resisting

enforcement of the arbitral award claimed the contract containing the arbitration clause had been

forged, so the parties had never agreed to arbitrate.  *See* 334 F.3d at 277.  Without issuing a

written opinion, the district court enforced the arbitral award.  The Third Circuit framed the

question before it as "whether a foreign arbitration award might be enforceable regardless of the

validity of the arbitration clause on which the foreign body rested its jurisdiction."  *Id.* at 279.

Applying the rule articulated in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) to

the international arbitration context, the court stated that the common principles in arbitration

decisions "suggest that the district court here had an obligation to determine independently the

existence of an agreement to arbitrate even though an arbitration panel in a foreign state already

had rendered an award."  *Id.* at 284; *see First Options*, 514 U.S. at 944 ("If . . . the parties did *not*

agree to submit the arbitrability question itself to arbitration, then the court should decide that

question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.").

Applying the facts before the Court, this reasoning is consistent with that in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006), in which the Supreme Court "distinguished between '[t]he issue of the contract's validity,' which is *not* for the court to resolve, and 'the issue [of] whether any agreement between the alleged obligor and obligee was ever concluded,' which the courts might be allowed to consider." *Belize Soc. Dev, Ltd. v. Gov. of Belize*, 5 F.Supp.3d 25, 39 n.22 (D.D.C. 2013) (analyzing *China Minmetals* and quoting *Buckeye*, 546 U.S. at 444). Unlike the respondent in *China Minmetals,* the GOB does not argue that the arbitration clause of the Settlement Deed was independently invalid and also failed to raise its argument that the contract was void *ab initio* before the arbitral panel. *See* Mot. at 5 (admitting the GOB chose "not to participate in the arbitration").

The GOB's insistence that it did not agree to arbitrate because the contract is invalid is also inconsistent with the language of the New York Convention. Article V(1)(a) provides that an arbitral award may be refused only if the party that is challenging enforcement furnishes to the competent authority proof that "[t]he parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected to it . . ." N.Y. Convention, art. V(1)(a). The agreement referred to in Article II of the Convention is "an agreement in writing under which the parties undertake to submit to arbitration all or any differences . . . . The term 'agreement in writing' shall include an arbitral clause in a contract." *Id.* at art. II. Therefore, a challenge brought under Article V(1)(a) must be brought against the agreement to arbitrate, not against the contract as a whole. *See* Restatement (Third) of Int'l Comm. Arb. § 4-12 cmt. e. (Draft No. 3,

2011) (Under Article V(1)(a), "courts do not review the arbitral tribunal's rulings on challenges to the validity of the contract as a whole, such as a claim that a contract including an arbitration clause was fraudulently induced or is illegal."); *see also Nanosolutions, LLC v. Prajza*, 793 F.Supp.2d 46, 54-55 (D.D.C. 2011) ("[T]he FAA prohibits a district court from considering . . . challenges [to] the contract as a whole.").

The LCIA arbitral panel examined the question of the legality of the contract in assessing its jurisdiction and concluded that "the widely accepted doctrine of the separability of the arbitration clause contained in a contract would preserve the validity of the arbitration clause in the Settlement Deed as Amended and the jurisdiction of this Tribunal in this case." Award at ¶ 62.[6] Contrary to the GOB's assertion that the arbitration clause cannot be severed from the contract in this manner (*see* Mot. at 28), it is settled law that "an arbitration provision is severable from the remainder of the contract." *Buckeye*, 546 U.S. at 445 (holding that an arbitrator should consider claims that a contract containing an arbitration provision is void for illegality).[7] Again, the GOB has not provided any proof to the Court that the provision in which

---

[6] The CCJ judgment also found that the arbitration agreement was enforceable. *See BCB Holdings Ltd, et al., v. Attorney General of Belize*, CCJ Appeal No. CV 7 of 2012, ¶ 55 ("The agreement to arbitrate was a free standing agreement separable from the remainder of the Deed.").

[7] The GOB argues that the severability rule is inapplicable because it pertains to the FAA and not to the FSIA. *See* Mot. at 26-28. As explained above, the Court is not required to conduct a *de novo* review of the arbitrability of the dispute to satisfy the jurisdictional requirements of the FSIA. *See infra* at Section III(A)(2). Indeed, the Court's analysis of the arbitrability of the dispute is confined to the GOB's Article V defense. Thus, principles available under the FAA, which incorporates the New York Convention, are available to the Court. *See, e.g., General Elec. Co. v. Deutz AG*, 270 F.3d 144, 155 (3d Cir. 2001) ("We recognize that *First Options* is a domestic arbitration case, but the international nature of the present litigation does not affect the application of *First Options'* principles.").

the parties agreed to arbitrate is invalid under Belizean law, so the GOB's challenge under Article V(1)(a) fails.

### 2. Article V(2)(a) – Appropriateness of Arbitration

The GOB also claims that this Court should deny confirmation of the revenue rule which precludes U.S. courts from adjudicating foreign tax liabilities. *See* Resp. to Pet. at 16. Article V(2)(a) of the New York Convention allows courts to refuse to enforce an award when "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country." N.Y. Convention, art. V(2)(a). "The revenue rule is a long-standing common law rule that prevents the courts of one sovereign from enforcing or adjudicating tax claims from another sovereign." *Rep. of Honduras v. Philip Morris Co., Inc.*, 341 F.3d 1253, 1256 (11th Cir. 2003). In cases in which the revenue rule has been applied, "[t]he main object of the action . . . was the collection of money that would pay foreign tax claims." *Pasquantino v. U.S.*, 544 U.S. 349, 364 (2005). In *Pasquantino*, the Supreme Court articulated the link between the revenue rule and the rule against foreign penal enforcement, analyzing the "analogy between foreign revenue laws and penal laws." *See id.* at 361.

No such link is present in the instant case. Petitioners did not bring their claim to the arbitral tribunal in an attempt to enforce Belize's tax laws. Indeed, the LCIA determined that the revenue rule did not apply because this is a contract case, not an action to enforce Belizean tax laws. *See* Award ¶ 180. The crux of the dispute was contract enforcement rather than the enforcement of a foreign revenue law. *See* Opp. to Resp. to Pet. at 27 (explaining the dispute arose out of an alleged breach of warranties contained in the Settlement Deed). Thus, the subject matter arbitrated was contemplated by the parties and capable of settlement by arbitration.

3.  Article V(2)(b) – Public Policy

Lastly, the GOB argues that confirmation of the Award should be denied because the Award violates the public policy of the United States against government corruption.  *See* Resp. to Pet. at 17.  "The public-policy exception under the New York Convention is construed extremely narrowly and applied 'only where enforcement would violate the forum state's most basic notions of morality and justice.'"  *Chevron Corp.*, 949 F.Supp.2d at 69 (D.D.C. 2013) (quoting *Parsons v. Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974)); *see also Termio Rio S.A. E.S.P.*, 487 F.3d at 938 (quoting *Karaha Bodas*, 364 F.3d at 305-06).  "Although this defense is frequently raised, it 'has rarely been successful.'"  *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Systems, Inc.*, 665 F.3d 1091, 1097 (9th Cir. 2011) (quoting Andrew M. Campbell, *Refusal to Enforce Foreign Arbitration Awards on Public Policy Grounds*, 144 A.L.R. Fed 481 (1998) (collecting cases)).  Establishing a countervailing public policy that weighs against enforcement of an arbitral award is a "substantial" burden and requires the moving party to "demonstrate a countervailing public policy sufficient to overcome [the] strong policy favoring confirmation." *Id.* at 1098.  "Such a public policy . . . must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests."  *United Broth. Of Carpenters and Joiners of America, AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 697 (D.C. Cir. 2013) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983)) (internal quotation marks omitted); *see also Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 190 F.Supp.2d 936, 955 (S.D.Tex. 2001).  *See*

22

*also Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1445 (11th Cir. 1998).

The GOB relies on a broad policy statement, arguing that "[j]ustice and U.S. public policy against corruption will not be served by allowing this corrupt agreement and tainted Award to burden the people of Belize." Resp. to Pet. at 18. In so doing, the GOB does not identify an explicit or well-defined U.S. public policy that, if violated, would offend the most basic notions of morality and justice. Although this Court recognizes that "the United States has a strong public policy against corruption abroad," this policy does not reach the threshold required to outweigh the policy in favor of enforcement. *Belize Soc. Dev. Ltd.,* 5 F.Supp.3d at 43 ("U.S. courts have enforced arbitral awards in the face of public policy interests *at least* as weighty as the policy against corruption abroad."). Indeed, the GOB cannot point to any cases in which a court declined to enforce an arbitral award because it violated the United States' public policy against government corruption. Additionally, the general public policy the GOB relies upon implicates the politics of a foreign nation. Article V(2)(b) "was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.'" *Parsons*, 508 F.2d at 974. Refusal to enforce the Award on the public-policy grounds suggested by the GOB would undoubtedly implicate politics abroad. The Court declines to do so. The GOB has not met the substantial burden of proving its public-policy defense.

### F.  The Award

Conversion of foreign currency into dollars at judgment "is the norm, rather than the exception." *Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F.Supp.2d 153, 158 (D.D.C. 2013), *aff'd*, 2015 WL 233385 (D.C. Cir. Jan. 16, 2015). The monetary relief in the Award shall be converted into U.S. dollars as of August 18, 2009, the date of the Award, and the

judgment will be entered in U.S. dollars. The Court also has discretion to award prejudgment

interest and will exercise that discretion because doing so is "consistent with the underlying

arbitration award." *Cont'l Transfer*, 932 F.Supp.2d at 164 (internal quotation marks omitted).

*See also Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*, 665

F.3d at 1103 ("[F]ederal law allows a district court to award post-award, prejudgment interest in

actions under the New York Convention."); *Waterside Ocean Nav. Co., Inc. v. Int'l Nav. Ltd.*,

737 F.2d 150, 153-54 (2d Cir. 1984); *Indus. Risk Insurers*, 141 F.3d at 1445. The arbitral

tribunal awarded petitioners pre- and post-judgment interest at an annual rate of 3.38%

compounded annually. Award ¶ 149. The Court accepts this determination and awards

petitioners interest consistent with the Award calculated from the date the Award, August 18,

2009, to this date. The parties are ordered to submit to the Court proposed judgment amounts

calculated with the conversions and interest consistent with this opinion.

## IV. CONCLUSION

For the foregoing reasons, the Court shall GRANT the Petition to Confirm Foreign

Arbitration Award; convert the monetary relief in the Award into U.S. dollars; and award

prejudgment interest. The complaint in the alternative is dismissed as moot. Likewise, the

motion to dismiss is DENIED as moot. An appropriate Order accompanies this Memorandum

Opinion.


  /s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge