**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **The Belize Bank Limited,** | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **Civil Action No. 14-cv-659 (APM)** |
| **Government of Belize,** | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

This case is one in a recent series of cases filed in this District Court in which Respondent Government of Belize finds itself seeking to prevent the confirmation of an international arbitration award entered against it. In two cases that preceded this one—*Belize Social Development Ltd. v. Government of Belize*, No. 09-cv-2170 (RJL), and *BCB Holdings Ltd. v. Government of Belize*, No. 14-cv-1123 (CKK)—the district courts confirmed the arbitration awards at issue and, in both cases, the Court of Appeals affirmed the district courts' rulings.[1] In *Belize Social Development* and *BCB Holdings*, the Government of Belize raised many of the same arguments that it has raised in this case. This court, therefore, does not write on a clean slate. Indeed, as will be seen, the Court of Appeals' decisions in *Belize Social Development* and *BCB Holdings* foreclose several of Respondent's arguments made in these proceedings.

[1] The Court of Appeals also affirmed another arbitration award confirmation against Belize in *Newco Ltd. v. Gov't of Belize*, No. 15-7077, 2016 WL 3040824, at *1 (D.C. Cir. May 13, 2016).

Petitioner The Belize Bank Limited ("Bank") brings this action against Respondent Government of Belize ("Belize") to enforce a 2013 arbitration award issued by the London Court of International Arbitration in London, England. The Bank was awarded BZ$36,895,509.46[2] plus interest and now seeks to confirm the award under the Federal Arbitration Act, 9 U.S.C. § 201, *et seq.*, which codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

For the reasons below, the Bank's Petition to Confirm the Foreign Arbitration Award will be granted and Belize's Motion to Dismiss the Petition will be denied.

## II. BACKGROUND

### A. Factual Background

From 2001 to 2004, the Bank entered into various loan agreements with Universal Health Services Company Limited, a health services provider in Belize. Pet. to Confirm Foreign Arbitration Award, ECF No. 1 [hereinafter Pet.], ¶ 14. In December 2004, Said Musa, Belize's then-Prime Minister and Minister of Finance, signed a "Guarantee and Postponement of Claim Agreement" ("Guarantee") on the behalf of Belize, which purported to guarantee payment to the Bank of all debts and liabilities owed to the Bank by Universal Health Services. Resp't's Prelim. Resp. to Pet., ECF No. 13 [hereinafter Resp.], at 3.

In early 2007, it became apparent to the Bank that Universal Health Services would be unable to service its debt to the Bank. Pet. ¶ 15. When Belize declined to satisfy the debt under the Guarantee, Belize entered into a Settlement Deed with the Bank in March 2007 to discharge its liability under the Guarantee. *Id.* ¶ 16. Integrated into the Settlement Deed was a Loan Note that obligated Belize to pay the Bank a total of BZ$33,545,820, with interest accruing daily and

---

[2] "BZ$" signifies Belizean dollars.

compounded monthly on demand or in any event no later than September 23, 2007. *Id.* ¶ 17. Belize, however, failed to pay the Bank the first monthly interest payment, which was due on April 23, 2007. *Id.* ¶ 20. On May 9, 2007, the Bank notified Belize that it was in default on the Loan Note and invoked a provision accelerating the full amount of the principal together with all accrued interest. *Id.* Belize did not respond to the demand or make any payment. *Id.*

The Bank then invoked a dispute resolution clause contained in the Settlement Deed, requiring the parties to arbitrate any disputes in London, England, under the Rules of the London Court of International Arbitration ("LCIA"). *Id.* ¶¶ 18, 22. The Bank commenced arbitration proceedings under the LCIA Rules in May 2007, seeking, among other things, a declaration that the Settlement Deed and Loan Note were valid and payment of the sums due under the Loan Note. *Id.* ¶ *22.* Belize did not, however, participate in the arbitration. *Id.* ¶ 23. In July 2007, the arbitral tribunal rendered a Partial Award on Jurisdiction, holding that it had jurisdiction over the dispute. *Id.* ¶ 25. Following the Partial Award, in January 2008, the Bank and Belize entered into a settlement agreement ("2008 Settlement Agreement") that terminated the arbitration proceedings before entry of a Final Award. *Id.* ¶ 26.

In February 2008, following elections, the government of Belize changed. *Id.* ¶ 27. The new government sought to invalidate the 2008 Settlement Agreement through litigation in the Belizean courts. *Id.* ¶¶ 27-28. The Bank, however, succeeded in obtaining an order from the Belizean Supreme Court—a trial level court—that stayed the local litigation in favor of arbitration proceedings. *Id.* ¶ 32. Deeming the litigation to be a violation of the 2008 Settlement Agreement, the Bank re-initiated arbitration under the LCIA Rules on July 9, 2008. *Id.* ¶ 33. In the 2008 Arbitration, the Bank sought a declaration that the 2008 Settlement Agreement was valid and payment of the amounts owed under that Agreement. *Id.* Alternatively, the Bank asserted that, if

the 2008 Settlement Agreement was not valid, the Bank was entitled to collect damages based on Belize's breach of the Loan Note attached to the Settlement Deed. *Id.*

Again, Belize did not initially participate in the 2008 Arbitration. *Id.* ¶ 34. The LCIA appointed the same arbitral tribunal that presided in the prior proceedings. *Id.* The panel issued the First Partial Award on August 4, 2009, holding that the panel "had jurisdiction over the Bank's claims arising out of the 2008 Settlement Agreement. . . . [but] that part of the 2008 Settlement Agreement was void." *Id.* ¶ 36. The tribunal reserved for later consideration all other issues, including the Bank's alternative claims under the Settlement Deed and Loan Note. *Id.*

Following a two-year stay to allow for the conclusion of new litigation filed in the Belizean courts, the second phase of the 2008 Arbitration began in late 2011. *Id.* ¶ 41. Belize elected to participate in that phase of the proceedings. *Id.* Belize soon thereafter made various challenges to the composition of the arbitral panel, which the LCIA denied. *Id.* ¶¶ 42-45. Belize then withdrew from the 2008 Arbitration. *Id.* ¶ 46.

On January 15, 2013, the arbitral tribunal entered a Final Arbitration Award in favor of the Bank. *Id.* ¶ 47. The panel found that the Loan Note was valid and enforceable and that Belize had breached it. *Id.* It ordered Belize to pay the Bank the sum of BZ$36,895,509.46, plus interest at 17%, compounded on a monthly basis from September 8, 2012, until the date of payment. *Id.* Belize refused the Bank's demand for payment in the full amount of the Final Award. *Id.* ¶ 48.

**B. Procedural History**

On April 18, 2014, the Bank filed in this court a Petition to Confirm Foreign Arbitration Award and to Enter Judgment. *See generally* Pet. Belize moved to dismiss the Petition, *see generally* Mem. of P. & A. in Supp. of Resp't's Mot. to Dismiss, ECF No. 12-1 [hereinafter Mot.

to Dismiss], and filed a Preliminary Response to the Petition, *see generally* Resp. The Petition and the Motion to Dismiss are now ripe for consideration.

## III. DISCUSSION

### A. Belize's Motion to Dismiss

Belize advances a host of arguments for dismissal of the Bank's confirmation petition. They are as follows: (1) the court lacks subject matter jurisdiction because Belize has foreign sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"); (2) dismissal is appropriate under the doctrine of *forum non conveniens*; (3) the court lacks personal jurisdiction over Belize; and (4) dismissal is warranted on grounds of international comity. The court considers each of these arguments in turn.

#### 1. Subject Matter Jurisdiction

Our Court of Appeals recently has explained that:

> Where jurisdiction is sought over a foreign sovereign for the enforcement of an arbitral award, we have held two conditions must be satisfied: "First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, [the foreign sovereign] must not enjoy sovereign immunity from such an enforcement action."

*Diag Human, S.E. v. Czech Republic–Ministry of Health*, No. 14-7142, 2016 WL 3064507, at *2 (D.C. Cir. May 31, 2016) (quoting *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999)). As the Court of Appeals did in *Diag Human*, this court will review those conditions in reverse order.

##### a. Sovereign immunity

"The Foreign Sovereign Immunities Act 'provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.'" *Id.* at *3 (quoting *Argentine Republic v. Amerada Hess Shipping Co.*, 488 U.S. 428, 443 (1988)). The Act bars federal and state courts

from exercising subject matter jurisdiction when a foreign state is entitled to immunity, but confers jurisdiction upon federal district courts to hear suits when a foreign state is not. *Id.*

In this case, the Bank argues that Belize is not entitled to sovereign immunity on two grounds. First, the Bank asserts that Belize explicitly waived immunity in Clause 9.5 of the Settlement Deed, *see* 28 U.S.C. § 1605(a)(1). Mem. of P. & A. in Supp. of Pet. to Confirm Arbitration Award, ECF No. 1-1 [hereinafter Pet. Mem.], at 10. Second, the Bank contends that the arbitration exception applies, 28 U.S.C. § 1605(a)(6). *Id.* at 11. Belize counters that neither exception is applicable, for one main reason: the former Prime Minister lacked actual authority to execute the agreements at the center of the parties' dispute, "including the Settlement Deed that contained the arbitration clause." Mot. to Dismiss at 11.

The parties spend significant time debating the importance and purported binding effect of foreign court decisions that address the former Prime Minister's authority to enter into the underlying agreements. *See* Mot. to Dismiss at 13-14; Belize's Suppl. Br., ECF No. 30; Bank's Supp. Br., ECF No. 31. But those foreign decisions are of no consequence—and thus have no binding effect—in light of the Court of Appeals' decision in *Belize Social Development Ltd. v. Gov't of Belize*, 794 F.3d 99, 102-03 (D.C. Cir. 2015).[3]

Like here, Belize argued in *Belize Social Development* that the FSIA's arbitration exception did not apply because the former Prime Minister lacked the actual authority to enter into the underlying agreement that led to the parties' dispute and arbitration. *Id.* at 102. The Court of Appeals, however, rejected that argument on the ground that the arbitration clause was severable

[3] In any event, it is doubtful that these foreign court decisions would have any preclusive effect on the question whether this court should confirm the arbitration award. *See Belize Social Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 730 (D.C. Cir. 2012) (vacating district court's stay "[b]ecause the pending action in Belize has no preclusive effect on the district court's disposition of the petition to enforce pursuant to the [Federal Arbitration Act] and the New York Convention"); *see also BCB Holdings, Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 246 (D.D.C. 2015).

from the underlying agreement and that Belize had offered no evidence that the former Prime Minister lacked the authority to enter the agreement to arbitrate. *Id.* As the Court of Appeals put it: "Belize must show that the Prime Minister lacked authority to enter into the arbitration agreement. This Belize has failed to do." *Id*. So it is here. As in *Belize Social Development*, in this matter Belize has "present[ed] nothing beyond its bare allegation in support of its argument that the Prime Minister lacked authority to enter the a*greement to arbitrate*." *Id.* at 103 (emphasis added). Belize takes issue with the Court of Appeals' holding in *Belize Social Development*, *see* Resp. of Gov't of Belize, ECF No. 36, but this court of course is not free to ignore it. Accordingly, binding precedent compels the conclusion that the FSIA's arbitration exception applies in this case; therefore, Belize does not enjoy sovereign immunity from this enforcement action.

b. Basis for federal court enforcement

There also exists a basis for this court to enforce the arbitral award—namely, the Federal Arbitration Act, 9 U.S.C. § 201, *et seq.*, which, among other things, codifies the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention. Our Court of Appeals has held on more than one occasion that the New York Convention, as codified by the Federal Arbitration Act, *id.* § 202, grants federal courts jurisdiction to confirm international arbitral awards that arise from a "commercial" transaction, such as the one at issue in this case. *See Diag Human*, 2016 WL 3064507, at *5 ("We have already established that the New York Convention, as codified by the United States, grants federal courts jurisdiction over arbitration disputes that fall within its ambit."); *Belize Social Dev.*, 794 F.3d at 104 ("We thus conclude that the Accommodation Agreement is commercial and is governed by the New York Convention."); *Creighton Ltd.*, 181 F.3d at 123 ("[T]he New York Convention 'is

exactly the sort of treaty Congress intended to include in the arbitration exception.'") (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir. 1993)).

Belize offers two arguments for why the New York Convention does not provide a basis to enforce the arbitral award. First, it contends that the Convention does not apply "because Belize has not ratified it." Mot. to Dismiss at 19. But that argument is squarely foreclosed by an earlier Court of Appeals opinion in the *Belize Social Development* case. *See Belize Social Dev. Ltd.*, 668 F.3d at 730 n.3. In that decision, the Court of Appeals stated: "The fact that Belize is not a party to the New York Convention is irrelevant. If the place of the award is 'in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.'" *Id.* (quoting *Creighton*, 181 F.3d at 121). There, as here, the award was rendered in London. *See id.* Because both England and the United States are parties to the New York Convention, the United States courts must recognize and enforce the award against Belize. *See id.*

Second, Belize contends that the New York Convention does not apply, because it is not a "person" as that term is used in Article I(1) of the Convention. Mot. to Dismiss at 20. Article I(1) provides that "this Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences *between persons*, whether physical or legal." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, art. I(1), June 7, 1959, 21 U.S.T. 2517, 330 U.N.T.S. 38 (emphasis added). According to Belize, Article I(1) should be interpreted as excluding arbitration awards arising out of disputes involving foreign states. Belize, however, cites no case to support such a reading.[4] This court declines to adopt such a

---

[4] Belize does cite *Price v. Social People's Libyan Arab Jamahiriya*, 294 F.3d 82, 97 (D.C. Cir. 2002), for the proposition that the term "person" excludes foreign states, *see* Mot. to Dismiss at 20, but *Price* held that foreign states

narrow construction of the New York Convention, especially when the Court of Appeals consistently has held that the Convention, as codified, provides a basis for federal courts to enforce arbitral awards between private entities and foreign states. *See supra*.

Accordingly, the court concludes that it has subject matter jurisdiction with respect to the Bank's petition for confirmation.

2. *Forum Non Conveniens*

Next, Belize argues that the Bank's petition should be dismissed on *forum non conveniens* grounds, because "Belize is an adequate alternative forum, and the private and public factors also favor the Belizean forum." Mot. to Dismiss at 23. That argument, however, is foreclosed by the decisions in *Belize Social Development* and *BCB Holdings*. *See Belize Social Dev.*, 794 F.3d at 105 (affirming the district court's refusal to dismiss action based on *forum non conveniens* grounds); *BCB Holdings Ltd. v. Gov't of Belize*, 2016 WL 3042521, at *2 (D.C. Cir. May 13, 2016) (holding that Belize's *forum non conveniens* argument is "squarely foreclosed by our precedent") (citing *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005)).

3. Personal Jurisdiction and International Comity

*Belize Social Development* likewise forecloses Belize's arguments that (1) the court lacks personal jurisdiction over it and (2) dismissal is warranted on international comity grounds, Mot. to Dismiss at 26-32. *See Belize Social Dev.*, 794 F.3d at 105 (affirming the district court's refusal to dismiss action based on lack of personal jurisdiction and on international comity grounds); s*ee also GSS Group Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) (stating that "foreign sovereigns and their extensively-controlled instrumentalities are not 'persons' under the Fifth Amendment's Due process Clause—and thus have no right to assert a personal jurisdiction

---

were not "persons" for purposes of the U.S. Constitution's Due Process Clause. That decision has little relevance to what the term "person" means under the New York Convention.

defense.") (citations omitted); *cf. BCB Holdings*, 2016 WL 30242521, at *2 (affirming district court's refusal to reject enforcement of the arbitral award on international comity grounds).

**B. Belize's Defenses under the New York Convention[5]**

The court turns next to the grounds upon which Belize contends that the court should reject confirmation of the award under the New York Convention. A court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007) (citation omitted); *see also* 9 U.S.C. § 207; *Yusuf Ahmed Alghanim & Sons, W.I.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997) ("There is now considerable case law holding that, in an action to confirm an award rendered in, or under the law of, a foreign jurisdiction, the grounds for relief enumerated in Article V of the Convention are the only grounds available for setting aside an arbitral award."). Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading and Indus. Inv. Co. v. DynCorp Aerospace Technology*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011). "[T]he burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation," *id*. (internal quotation marks omitted) (quoting *Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976)), and "the showing required to avoid summary confirmation is high." *Id.* (internal quotation marks omitted) (quoting *Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987)).

Belize advances five grounds for rejecting the award: (1) the composition of the arbitral panel was not in accordance with the parties' agreement; (2) recognition of the award would be

[5] Given that arbitral award enforcement proceedings are to "take the form of summary procedure," *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007) (citation omitted), and given that the Court of Appeals' decisions in *Belize Social Development* and *BCB Holdings* have largely foreclosed Belize's jurisdictional arguments, the court declines Belize's request to allow an interlocutory appeal before proceeding to the merits.

contrary to the public policy of the United States; (3) the arbitration did not meet the minimum requirements of due process; (4) the underlying agreements are invalid under the laws of Belize; and (5) Belize is not a party to the New York Convention. Only the first of these arguments requires any extended discussion.

1. Article V(1)(d) – Improperly Constituted Arbitrator Panel

Article V(1)(d) of the New York Convention allows a court to refuse recognition and enforcement of the award where "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties." art. V(1)(d). Generally speaking, Belize contends that this court should not confirm the Final Award because the arbitral panel was not selected in accordance with the parties' agreement and the LCIA Rules. To understand that contention first requires a recitation of the relevant facts.

a. Belize's challenges to the arbitral panel

In Clause 9 of the Settlement Agreement, Belize and the Bank agreed to arbitrate any disputes in London, England, under the LCIA Rules and incorporated those Rules by reference into the Agreement. Pet., Kimmelman Decl., Ex. C, ECF No. 1-5, ¶¶ 9.2, 9.4. The parties also agreed that the arbitral tribunal would consist of three arbitrators, "one appointed by each Party and the third appointed jointly by the two Parties' arbitrators." *Id.* ¶ 9.2. When the Bank first commenced arbitration proceedings in 2007, Belize declined to participate, including refusing to exercise its right to appoint an arbitrator. Pet., Kimmelman Decl., Ex. E, ECF No. 1-7, at 1-2. As permitted by its Rules, the LCIA appointed an arbitrator in Belize's stead, Zachary Douglas. *Id.* at 2. The Bank selected Hilary Heilbron. *Id.* Douglas and Heibron jointly nominated Toby Landau as chair of the tribunal. *Id.* at 3. Belize eventually joined the arbitration, but raised no objection

to Douglas' appointment. *Id.* at 2. The 2007 arbitration panel was discharged after Belize and the Bank reached a settlement, i.e., the 2008 Settlement Agreement. *Id.*

The same trio again constituted the arbitral tribunal when the Bank re-initiated arbitration proceedings in 2008. *Id*. The Bank again nominated Heilbron, and Belize once more initially elected not to participate, including declining to appoint an arbitrator. Pet., Kimmelman Decl., Ex. B, ECF No. 1-4, at 11-12. As before, the LCIA appointed Douglas in Belize's stead, and Landau was nominated to be tribunal's chair. *Id.* at 12; *see also* Kimmelman Decl., Ex. E, at 2. The panel, as constituted, issued a First Partial Award on August 11, 2009. Kimmelman Decl., Ex. E, at 3.

Following a two-year long stay, the 2008 Arbitration moved to its second phase in December 2011. *Id.* This time, Belize elected to participate. *Id.* Soon thereafter, Toby Landau, the arbitral panel's chair, resigned in February 2012 because of a potential conflict of interest. *Id.* Belize then asked for the entire panel to be reconstituted pursuant to the procedure set forth in the arbitration agreement. *Id.* at 4. The LCIA rejected the request, concluding that the remaining arbitrators—Heilbron and Douglas—would nominate a new chair. *Id.* LCIA appointed Yves Fortier, based on his selection by Heilbron and Douglas. *Id.* at 9.

In March 2012, Belize challenged the continued service of Douglas on the panel. *Id.* at 5. Belize asserted that Douglas was conflicted because he was a member of Matrix Chambers, a British barristers' chambers. Another member of Matrix Chambers had represented interests adverse to Belize in prior litigation and had represented one Lord Michael Ashcroft, whose interests included the Bank. *Id.* Belize demanded that Douglas make certain disclosures—it submitted a list of 30 questions for Douglas to answer—about Matrix Chambers' practices and representations. *Id.* at 5-8. Douglas responded that he was of aware of no circumstances that

would call into question his impartiality or independence. *Id.* at 8. He further answered that he never inquired into the practices of any other Matrix Chambers members and was under no obligation to do so, as no "member of a barristers' chambers is obliged to provide details of his or her practice to another member of chambers" and "it would be a breach of a barrister's obligation of confidentiality to do so and would amount to professional misconduct." *Id.* Thereafter, Belize formally asked the LCIA again to reconstitute the panel and for Douglas' removal. *Id.*

In April 2012, LCIA created a "Division" consisting of three members to decide Belize's challenges to the arbitral panel. *Id.* at 10. The Division rejected Belize's challenges. *Id.* at 18. As to Douglas' supposed conflict because of his membership in Matrix Chambers, the Division ruled that Douglas was not required to answer the Bank's requested disclosures about Matrix Chambers because, unlike United States' law firms, barristers within a British chambers operate as independent practitioners. *Id.* at 14-15. The Division also ruled that Douglas' membership in Matrix Chambers did not create an appearance of bias. *Id.* at 16-18. Finally, the Division concluded that the LCIA Rules did not require a wholesale reconstitution of the panel when Landau resigned, and that it was proper simply for the remaining arbitrators to select a new chair, which they did. *Id.* at 18-20.

b. Belize's assertions under Article V(1)(d)

Invoking Article V(1)(d) of the New York Convention, Belize argues that the Final Award should not be enforced, because (1) the arbitral tribunal was not constituted in accordance with the parties' agreement because Belize was not permitted to nominate its own "wing" arbitrator, (2) the LCIA incorrectly concluded that Douglas was not required to make disclosures about Matrix Chambers, (3) the LCIA improperly refused to disqualify Douglas based on the appearance of a

conflict of interest created by his membership in Matrix Chambers, and (4) the LCIA erroneously rejected Belize's demand to reconstitute the panel. Resp. at 28-32.

As discussed, given the strong public policy in favor of international arbitration, a party challenging an award under the New York Convention bears a heavy burden. *See Encyclopaedia Universalis S.A. v. Encyclopedia Britannica, Inc.*, 403 F.3d 85, 90 (2d Cir. 2005). A district court's review is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Id.* (internal quotation marks and citation omitted). Moreover, where, as here, a party's challenge involves an application of the arbitral institution's own rules, courts typically have deferred to the arbitral panel's interpretation of them. *See, e.g.*, *York Research Corp. v. Landgarten*, 927 F.2d 119, 123 (2d Cir. 1991) ("Given the parties' designation of the AAA as the supervisory authority regarding the resolution of disputes under the agreement, the AAA's view of the meaning of its rules is of considerable significance."); *Ecopetrol S.A. v. Offshore Exploration and Production LLC*, 46 F. Supp. 3d 327, 344 (S.D.N.Y. 2014) ("[W]hen parties have adopted rules conferring on an arbitral panel authority to interpret the rules governing arbitration, courts should defer to the panel's interpretation of the rules governing arbitration." (citation omitted)).

Applying the foregoing standards, this court is not persuaded by any of Belize's challenges under Article V(1)(d). First, Belize forfeited its right to appoint a "wing" arbitrator by not initially participating in the 2007 Arbitration and 2008 Arbitration. Under LCIA Arbitration Rule Art. 2.3, *see* Kimmelman Second Decl., Ex. M, ECF No. 22-9, if, as here, "the Arbitration Agreement calls for party nomination of arbitrators, failure to send a Response [to the request for arbitration] or to nominate an arbitrator within time or at all shall constitute an *irrevocable waiver* of that party's opportunity to nominate an arbitrator." (emphasis added). With Belize having waived its right to

appoint an arbitrator, LCIA was authorized to appoint one in its stead under Articles 5.4, 5.5, and 7.2, which it did by appointing Douglas. *Id.*

Nor does the court perceive any error in the Division's rejection of Belize's demands that Douglas make various disclosures about Matrix Chambers and that he be removed because of a perception of bias created by his affiliation with Matrix Chambers. The Division's rejection of both demands turned on its conclusion that, unlike law firms in the United States, barristers in an English chambers are independent practitioners. Therefore, for conflicts purposes, Article 5.3 of the LCIA Rules did not require Douglas to disclose the potentially conflicting matters of other chambers members; nor did the matters of other chambers members require his disqualification from serving on the panel. Kimmelman Decl., Ex. E, at 14-17. The Division also reasonably explained why the main case relied on by Belize—*Hrvatsak Elektroprivreda, d.d. v. Republic of Slovenia*, ICSID Case no. ARB/05/24 (May 6, 2008)—was distinguishable and did not compel a contrary result. *Id.* It is not for this court, given its limited scope of review, to second-guess the Division's interpretation of LCIA's conflict rules and its application of *Hrvatsak*.

Finally, the court finds no error in the LCIA's and the Division's rejection of Belize's demand to reconstitute the arbitral panel anew after Landau's resignation. Under Article 11.1 of the LCIA Rules, "if an appointed arbitrator is to be replaced for any reason, the LCIA Court shall have a complete discretion to decide whether or not to follow the original nominating process." *see* Kimmelman Decl., Ex. M, ECF No. 22-9, at 6. When Landau resigned, instead of permitting, as the Bank asked, the parties to re-nominate their respective "wing" arbitrators to select a new chair, the LCIA allowed the remaining arbitrators—Douglas and Heilron—to select a new chair. The decision was well within LCIA's "complete discretion" under Article 11.1, as nothing in that

Article, or any other, required LCIA to re-do the nominating process in its entirety after the chair's resignation.[6]

2. Article V(2)(b) – Contrary to U.S. Public Policy

Having concluded that Belize has not met its heavy burden of showing that the arbitral panel was constituted in violation of the parties' agreement, the remaining Article V defenses are disposed of easily. Belize next argues that the Final Award should not be enforced because, under Article V(2)(b), enforcing an award rendered by arbiters who were not impartial would be contrary to United States public policy. *See* Resp. at 32-39; New York Convention art. V(2)(b) (stating that recognition and enforcement may be refused where the award would be "contrary to the public policy of [the] country.").

Courts may rely on Article V(2)(b)'s public policy exception "in clear-cut cases" where "enforcement would violate the forum state's most basic notions of morality and justice." *Termorio*, 487 F.3d at 938 (citations omitted). Even if the norm of an unconflicted arbitral panel is rooted in this country's "basic notions of morality and justice"—a showing that Belize has not convincingly made—it has not shown how that norm was violated here. As discussed, the LCIA's and the Division's decisions rejecting Belize's challenges to the arbitral panel were well reasoned and consistent with the LCIA's Rules. The court finds nothing about the selection process of the arbitrators in this case that would offend United States public policy.

3. Article V(1)(b) – Failed to Meet Due Process

The court likewise rejects Belize's contention that the Petition should be denied pursuant to Article V(1)(b) of the Convention. That Article allows a court to refuse recognition and

---

[6] In light of the foregoing conclusions, the court rejects Belize's request for limited discovery concerning arbitrator Douglas' alleged impartiality, Resp. at 41. *See In re Andros Compania Maritima, S.A. & Marc Rich & Co., A.G.*, 579 F.2d 691, 702 (2d Cir. 1978) (affirming district court's rejection of discovery into arbitrator's alleged conflict where "clear evidence of impropriety has not been presented").

enforcement of an award if "[t]he party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case." art. V(1)(b). That provision "essentially sanctions the application of the forum state's standards of due process." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (Rakta)*, 508 F.2d 969, 975 (2d Cir. 1974). Under United States law, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted). Thus, as the Second Circuit has put it, under Article V(1)(b), if the losing party "was denied the opportunity to be heard in a meaningful time or in a meaningful manner, enforcement of the Award should be refused pursuant to Article V(1)(b)." *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992).

Belize argues that "the arbitration proceeding did not meet minimum requirements of due process because the arbitration panel did not provide the required element of impartiality" under Article V(1)(b) of the New York Convention. Resp. at 39. But Belize has not shown how the panel's alleged impartiality deprived it of an opportunity to be heard. Indeed, Belize walked out of the 2008 Arbitration after receiving an unfavorable ruling from the Division. Any lost opportunity to be heard therefore was self-inflicted.[7]

4. Article V(1)(a) – Invalid under Belizean Law

Belize further argues that "[t]he Petition should also be denied because the Guarantee, the Settlement Deed, and the Loan Note were not valid under the laws of Belize," thereby requiring non-enforcement under Article V(1)(a). Resp. at 40. Article V(1)(a) of the Convention allows a

[7] To the extent that Article V(1)(b)'s also guarantees "a fundamentally fair hearing" under United States law, which mandates a court to review whether the respondent was afforded an "impartial decision by the arbitrator," then Belize has failed to demonstrate impartiality. *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 592 (7th Cir. 2001) (citations omitted); *see also, supra* section III(E)(1).

court to refuse recognition and enforcement if "*said agreement is not valid under the law to which the parties have subjected it* or, failing any indication thereon, under the law of the country where the award was made." art. V(1)(a) (emphasis added). Belize relies on *China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 289 (3d Cir. 2003), for the proposition that "a party that opposes enforcement of a foreign arbitration award under the Convention on the grounds that the alleged agreement containing the arbitration clause on which the arbitral panel rested its jurisdiction was void *ab initio* is entitled to present evidence of such invalidity to the district court." The district court then "must make an independent determination of the agreement's validity and therefore of the arbitrability of the dispute, at least in the absence of a waiver precluding the defense." *Id.* Belize, therefore, argues that because the underlying agreements were unlawful under Belize law, the arbitration clause itself was invalid. Resp. at 40-41. The Bank, for its part, reads *China Minmetals* more narrowly, construing the case to stand for the unremarkable proposition that a party may challenge the existence or validity of the agreement to arbitrate directly, as opposed to indirectly by challenging the agreement as a whole. Pet'r's Mem. of P. & A. in Opp'n, ECF No. 21, at 40-41.

However one reads *China Minmentals*, our Court of Appeals' decision in *Belize Social Development* forecloses the type of indirect challenge to the agreement to arbitrate that Belize attempts here. Again, in *Belize Social Development* the court held that an arbitration clause is segregable from the agreement as a whole. *Belize Social Dev. Ltd.*, 794 F.3d at 102. Accordingly, if there is a challenge under Article V(1)(a) to anything, it must be to the agreement to arbitrate itself, not the agreement as a whole. Here, Belize has not offered any evidence that the arbitration agreement itself is invalid under the law of Belize. Therefore, Article V(1)(a) does not provide a ground to deny the Petition.

**C. Arguments Concerning the Award**

1. Award in U.S. Dollars

The Bank asks the court to order payment on the Final Award in U.S. dollars. Pet. ¶ 58. The court will do so. "Conversion of foreign currency into dollars at judgment 'is the norm, rather than the exception.'" *BCB Holdings, Ltd.*, 110 F. Supp. 3d at 250 (quoting *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 158 (D.D.C. 2013), *aff'd*, 603 F. Appx. 1 (D.C. Cir. 2015)). Accordingly, the Final Award shall be converted to U.S. dollars as of January 15, 2013, the date of the Award, and the judgment will be entered in U.S. dollars.

2. Prejudgment Interest

As other courts have in similar confirmation proceedings, this court will award prejudgment interest, as requested by the Bank, Pet. at 14. *See BCB Holdings Ltd.*, 110 F. Supp. 3d at 251; *Belize Social Dev., Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 43-44 (D.D.C. 2013). The Final Award includes prejudgment interest from September 7, 2012, at a rate of 17% per annum, compounded monthly, until the date of payment. Pet. at 14. The court will award the Bank prejudgment interest consistent with the Final Award.

**IV. CONCLUSION**

For the foregoing reasons, the Bank's Petition to Confirm Foreign Arbitration Award and to Enter Judgment is granted, and Belize's Motion to Dismiss is denied. A separate Order accompanies this Memorandum Opinion.

Dated: June 8, 2016

Amit P. Mehta
United States District Judge